# SUPREME COURT

OF THE

## STATE OF COLORADO.

## April Term, 1907.

[No. 5206.]
[No. 2817 C. A.]

GUMAER, TRUSTEE, ETC., v. THE CRIPPLE CREEK TUN-
NEL, TRANSPORTATION & MINING COMPANY ET AL.

1. Corporations — Directors' Meeting — Quorum — Majority of
   Quorum—Powers.

   Where the board of directors of a corporation consists of
five members, and, under the by-laws, it requires four to con-
stitute a quorum, a majority of the quorum, being a majority
of the board, can legally do any act which the entire board
would be authorized to do.—P. 14.

2. Corporations—Directors—Regular Meetings—Notice.

   Directors of a corporation are bound to take notice of the
regular meetings of the board, and it is unnecessary to notify
them of such meeting.—P. 14.

3. Corporations—Officers—Services Rendered Outside of Regu-
   lar Duties—Compensation.

   The president of a corporation spent a great deal of time in
superintending the company's business; he saved its entire
property from being sold under execution and under decrees

to satisfy miners' and mechanics' liens; he undertook the placing of its stock; he assumed the entire supervision of its tunnel construction, the disbursement of funds, the employment of men, and the making of contracts; he devoted almost his entire time for a portion of each year to its financing and management; he expended a great deal in railroad and traveling expenses; and he also gave of his personal stock to secure the assistance of others. Held, that such services were outside of those of a director or president, and similar to those of a general manager, for which he was entitled to compensation voted him by the board as against a judgment creditor.—P. 15.

**4. Corporations—Officers—Money Advanced for Benefit of Company—Ratification.**

Where money was advanced by the president of a corporation for its benefit and with notice to its members, the directors have authority to ratify the execution of a note, evidencing such indebtedness, executed by the president and secretary of the corporation to the president.—P. 16.

**5. Corporations—Stockholders—Objection to Selling Price of Stock—Estoppel.**

A holder of stock originally issued to the president of the corporation cannot object to a resolution by which the company reduced the price paid for the stock by the president, since he is estopped to partake of the fruits of the fraud, if fraud there was, and be heard to complain.—P. 17.

*Appeal from the District Court of Arapahoe County.*
*Hon. Samuel L. Carpenter, Judge.*

Action by A. R. Gumaer, as trustee for E. L. Gumaer, against The Cripple Creek Tunnel, Transportation & Mining Company and Jacob Wallace. From a judgment for defendants, plaintiff appeals, and defendants assign cross-errors.    *Reversed.*

Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellant.

Messrs. BARTELS & SILVERSTEIN, for appellees.

Mr. JUSTICE BAILEY delivered the opinion of the court:

In February, 1896, Thomas Robinson was the

owner of certain mining claims and leases upon certain other mining claims situate in the Cripple Creek mining district. He believed that if a tunnel could be run through Beacon, Guyot, Raven and Bull hills, along the line covered by these leases and mining claims, that it would result in the discovery of valuable deposits of mineral. He lacked the means with which to construct this tunnel, and organized a corporation called The Cripple Creek Tunnel, Transportation and Mining Company, one of the defendants in this action. He caused to be issued to four persons, other than himself, one share each of the capital stock, for the purpose of enabling them to act as directors. He transferred to the corporation his mining claims and leases in consideration of the issuance to him of the balance of the stock, consisting of 60,000 shares of the par value of one hundred dollars each, less the four shares so issued to the other directors. He then executed a contract with defendant Wallace, whereby 40,000 shares were to be transferred to Rathvon as trustee, Wallace to have the right to purchase these shares on the following terms: Any portion of ten thousand shares which was purchased before July 1st, 1896, was to be paid for at the rate of $5.00 per share; any part of ten thousand shares which was purchased prior to Jan. 1st, 1897, at $10.00 per share; any part of ten thousand shares purchased prior to July 1st, 1897, at $15.00 per share, and any part of the last ten thousand shares purchased prior to Jan. 1st, 1898, at $20.00 per share. The proceeds of the sales were to go to the corporation for the purpose of excavating a tunnel and developing the property. It was believed that after the $50,000.00, which was to be paid for the ten thousand shares, had been expended, the remaining shares would become more valuable, because it was thought that some valuable

deposits of mineral would be discovered by that time and that as the tunnel progressed additional mineral would be discovered and the shares continue to increase in value, and for this reason each block of ten thousand shares was to be sold for a greater price than the preceding block.

Defendant Wallace found that he was unable to procure funds with which to purchase the first ten thousand shares within the time limited by the contract. Robinson talked with the other members of the company as to the advisability of extending the time in which Wallace should be permitted to purchase this stock, and, without any formal meeting of the board, it was agreed to extend the time. A contract of extension was made, signed by Robinson, Wallace, and by Wallace for the corporation, as he was then acting as president of the company. These ten thousand shares were eventually taken by Wallace and paid for at the rate of five dollars per share. The capital stock of the corporation which had been issued was then all owned by Robinson, who owned twenty thousand shares, and by Wallace, who owned ten thousand shares, and the three remaining directors, who owned one share each.

After expending the $50,000.00 which Wallace paid for the stock in driving the tunnel, no mineral was discovered. From time to time thereafter the time for paying for the stock by Wallace was extended in the same manner as the extension had been made for the purchase of the first ten thousand shares, and the price was reduced; so that for which he had agreed to pay $10.00 per share was sold to him for $2.50, and that for which he originally agreed to pay $15.00 and $20.00 per share was reduced to fifty cents per share, and for the entire 40,000 shares Wallace paid $85,000.00 instead of $500,000.00, as provided in the contract. The agree-

ment by which Wallace was to pay fifty cents per share, instead of $15.00 and $20.00, was made on the 25th of October, 1898.

In addition to the $85,000.00 paid by Wallace for the stock, he paid for the use and benefit of the corporation certain sums of money at various times, amounting in the aggregate to the sum of $9,778.28. This money was furnished for the purpose of paying employees, releasing the property from attachments and other liens which had been filed upon it. In addition to the furnishing of this money, Mr. Robinson, who was the only other heavy stockholder, testifies:

"Mr. Wallace undertook the entire placing of the stock of the company, and devoted almost his entire time. He assumed the entire supervision of the tunnel work in Cripple Creek, the disbursement of the funds, employment of men, making of contracts, and a general supervision of all of the work going on at the tunnel. His services differed from the other officers of the company in that he devoted almost his entire time for a part of each year to the financing and management of the tunnel. The other directors did not do anything, except Mr. S. F. Rathvon, who was secretary and treasurer, performed the duties of this office. The value of Mr. Wallace's services to the company was fully eight thousand dollars. In my opinion a fair and reasonable compensation for Mr. Wallace's services was more than eight thousand dollars."

This testimony is not contradicted. In addition to services performed by Wallace in the management of the company, he gave to the late Charles H. Toll five hundred shares of his individual stock, to compensate him for services rendered to the company as its general counsel. He also gave to Lyman E. White for services as foreman fifteen hundred

shares, and to Mr. Stearns, one of the directors, one hundred shares, and 3,750 shares to the plaintiff, which last mentioned shares made the basis of this suit.

For the money advanced for the use of the corporation, Mr. Wallace, as president of the company, together with the secretary, made promissory notes payable to Wallace. On the 7th of May, 1900, at a meeting of the board of directors, Wallace presented these notes as a claim against the company, and also by a written communication recited services he had rendered for the company during the four years and more of its existence, and asked to be paid for such services. A resolution was passed by the directors authorizing the execution of an additional note, payable to Wallace, for $8,000.00 in payment for such services, and authorizing the employment of an attorney who should, in the event of an action being brought upon the notes, appear for the corporation and admit the indebtedness.

The by-laws of the corporation provide that it requires four directors to constitute a quorum for the transaction of business. The minutes kept by the secretary recited that at this meeting upon May 7th, there were present Jacob Wallace, president; Thomas Robinson and S. F. Rathvon, directors; but Mr. Stearns, another director, testifies:

"I was present at the meeting of the board of directors of said company held    *    *    *    on the 7th day of May, 1900    *    *    *    I have not seen the minutes of said meeting since they were written up, but if they do not show that myself, Samuel Rathvon and Thomas Robinson, directors, were present    *    *    *    then such minutes have not been made up in accordance with the facts."

Mr. Rathvon, the secretary, in his testimony did not say that Stearns was not present, and did not

know when the minutes were written.  Mr. Robinson and Mr. Wallace also testified that at this meeting there were four members of the board present.

Subsequently Wallace obtained a judgment against the company upon these notes for $17,778.28.

In November, 1898, the tunnel had been driven about 2,400 feet, and no mineral had been discovered. The company borrowed from the plaintiff $6,000.00, executed its note therefor, the first four months to be without interest and thereafter to draw interest at the rate of 24 per cent. per annum.  At the time of the making of this loan, and apparently as an inducement for the making of it, Mr. Wallace gave to the plaintiff 3,750 shares of his stock, for which the plaintiff paid nothing.  This note was not paid, and plaintiff brought action upon it and obtained judgment May 15th, 1900, for $7,480.00.  To save the company's property from sale by virtue of this judgment, Wallace paid bonuses to plaintiff for extensions from time to time, and finally purchased the judgment.  The money paid for the judgment and for the various extensions of time thereon amounted to $9,400.00 which, with the 3,700 shares of stock, was what plaintiff received for a loan of $6,000.00.

Shortly after this judgment was purchased by Wallace, namely, on the 20th of May, 1901, this action was commenced by the plaintiff against the corporation and Wallace.  Plaintiff complains that the extension of the time in which the defendant Wallace was to purchase the stock and the reduction of the price which he was to pay was fraudulent and illegal, because the same was not formally authorized by the board of directors.  He also contends that the execution of the notes of the corporation to Wallace was unlawful and without consideration.  Plaintiff asks that the 40,000 shares of stock be returned to the treasury of the company, or that Wallace be com-

pelled to pay the sum of money required to be paid by the original agreement, and that he be compelled to satisfy and discharge the judgment.

To this complaint an appropriate answer and a replication to the answer were filed. The matter was tried to the court and the court found that, inasmuch as the shares of stock owned by plaintiff were obtained from defendant Wallace and formed a part of the stock obtained by said defendant under the contract and the various modifications thereof, plaintiff was not in a position to make complaint in reference to the stock, and that the meeting of the board of directors of May 7th, which authorized the execution of the $8,000.00 note, and a confession of judgment on that note as well as the others held by the defendant, was not a legal meeting because James B. Orman, one of the directors of the company, had no notice thereof, and that it requiring four directors to constitute a quorum, and there only being four present, including Wallace, who was not entitled to vote, there was no quorum; that, therefore, the resolution was not legally adopted and so much of the judgment as was based on the $8,000.00 note was invalid, and a decree was rendered accordingly.

Plaintiff brings the matter here upon appeal, and the defendants assign cross-errors, complaining that the court erred in its findings as to the $8,000.00 note.

We will dispose of the matters in controversy in the order in which they are presented in the briefs.

It is contended that no quorum was present at the meeting and the resolution was not legally passed. As we have stated, the minutes of the meeting recite the presence of Wallace, Robinson and Rathvon. The secretary did not testify that Stearns, a director, was not present. Stearns testified that he was, and

Wallace and Robinson each testified that there were four members present. The secretary did not know when the minutes were written. It would have been very easy for the secretary to have honestly omitted the name of Stearns from among those present, even though he was there, while it would have been impossible for Stearns to remember that he was there and have a clear idea of the proceedings as they occurred if, in fact, he had not been there. One may fail to remember the happening of an event though it occurred, but it is impossible to remember that which never happened. So, we will take it for granted that Mr. Stearns was present and took part in the meeting.

Plaintiff contends that even though Mr. Stearns was present, the resolution was illegally passed, for the reason that Mr. Wallace's interest in the matter under consideration disqualified him and broke the quorum.

In 2nd Cook on Stock and Stockholders, § 657, cited by plaintiff, it is said:

"The voting of a salary or compensation * * * must be entirely free from fraud, actual or constructive. The vote is illegal if it is carried only by including the vote of the director who receives the salary or pay."

This authority is not in point, for the reason that, while there were four directors present, including Wallace, Wallace did not vote either for or against the resolution. The other three directors voted for it.

In section 3929, 3rd Thompson on Corporations, cited by plaintiff, it is said:

"It is perfectly clear * * * that where a bare quorum is assembled, no contract can be made with a member of that quorum; because such a contract requires his concurrence, and he cannot be on

both sides of the same contract. As to *that* contract he is not a *director*, but is a stranger; and when he steps out of the bare quorum and assumes the attitude of a stranger, the quorum is broken."

The learned author cites as an authority to this proposition only the case of *Miner v. Belle Isle Ice Co.*, 93 Mich. 97. In that case it appears that there were but three directors. They were Lorman, Miner and Linn. At the directors' meeting it was proposed to make Lorman president and superintendent at a salary of $4,000.00. Miner objected and moved to adjourn, and, upon the failure of his motion, left the meeting. Afterwards, Linn and Lorman only being present, Linn moved that Lorman be elected president at a salary of one thousand dollars per year as president and three thousand dollars per year as manager. Lorman seconded the motion and Lorman and Linn voted aye. So it may be seen that out of the three directors there was only one of those who voted upon the proposition who was qualified to vote. Lorman, being interested in the motion, could not vote, and Miner had left the meeting, so that the only legal vote cast for the resolution was that of Linn. Under such circumstances the court very properly held that the resolution was not legally passed; but that is not this case. At the meeting of the directors here there were four out of five present; the fifth Governor Orman, being absent. Three of the four, constituting a majority of the entire board, voted for the resolution. After a somewhat careful examination of the authorities, we are inclined to believe that the resolution was regularly and properly adopted.

In 2 Kent's Commentaries, *293, the rule is laid down as follows:

"The same principle prevails in these incorporated societies as in the community at large, that the acts of the majority, in cases within the charter

powers, bind the whole. The majority here means the major part of those who are present at a regular corporate meeting. There is a distinction taken between a corporate act to be done by a select and definite body, as by a board of directors, and one to be performed by the constituent members. In the latter case, a majority of those who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide."

This doctrine, as laid down by Chancellor Kent, is cited with approval by the following authorities among others: Angell and Ames on Corporations, § 501; *Leavitt v. Oxford & G. S. M. Co.*, 3 Utah 272; *Van Hook v. Somerville Mfg. Co.*, 5 N. J. Equity 167; *Foster v. Mullanphy P. M. Co.*, 92 Mo. 88.

In the case of *Sargent v. Webster*, 13 Metcalf 504, it is said:

"In ordinary cases, when there is no other express provision, a majority of the whole number of an aggregate body, who may act together, constitute a quorum, and a majority of those present may decide any question upon which they can act."

In *Buell v. Buckingham & Co.*, 16 Iowa (Withrow) 284, it appears that at a meeting of the board of directors of the corporation at which Elijah Buell, president, and Robert Buell and Robert Spear, directors, were alone present, a quorum under the by-laws being the president and two directors, certain property of the corporation was sold to Elijah Buell, in consideration of an indebtedness by the corporation to him. Cole, J., said:

"In this case, although the requisite number of directors was present, Elijah Buell was disqualified from acting in the matter of the sale to himself; and the question then is, Can a majority of the

quorum, which is itself but a bare majority, do a binding act?''

Then, after citing what has heretofore been said as the utterance of Chancellor Kent, the Justice proceeds:

''Mr. Dane illustrates the same rule, as follows: 'If the charter requires twelve common councilmen to elect or do an act, seven of them at least must be present, though four of the seven may give the vote,' etc.—5 Dane's Abridg. 150; see, also, Angell and Ames on Corp., § 571; *Cahill v. Kalamazoo Insurance Company*, 2 Doug. (Mich.) 124; *Sargent v. Webster*, 13 Met. 497; *In re Insurance Company*, 22 Wend. 591; *Ex parte Willcocks*, 7 Cow. 402.

''It follows then, in the light of these authorities, that since the president and two of the directors constituted a quorum, it was competent for two, being a majority of that quorum, to bind the corporation; and if two were able to act, even as against the opposing vote of the other, they could, *a fortiori*, act without his concurrence.''

The Justice then proceeds to say that which is peculiarly applicable to this case (it being remembered that Mr. Wallace was the president of the corporation):

''The ordinary duties of the president are to preside, determine questions of order, give the casting vote in case of a tie, etc.; and since the vote of the directors was unanimous, there was no occasion or opportunity for the president to cast his vote, even if he had not been disqualified; and the contract of sale was made by just as many directors as was required by the by-laws, or as it was possible to have in the corporation as constituted.''

In the same case, at page 290, Dillon, J., says·

''Three constituted a quorum. So far all is clear. Advancing in the argument, the first proposi-

tion I lay down is, that a majority of the quorum, all being present, have the power to act, and to decide any question upon which they can act. This proposition is clear upon the authorities.''

He then proceeds to cite a number of authorities in support of the doctrine, which it is not necessary to repeat here.

*Hax v. Davis Mill Co.,* 39 Mo. App. 453, is an action instituted to recover of the milling corporation a salary alleged to be due plaintiff as president of the corporation. The court says:

''There is no question as to the plaintiff's disqualification to vote on his own salary * * * It appears, then, that a majority of all the directors voted on the question and that a majority of those voting voted for the resolution and, in our opinion, legally adopted it. In the absence of anything to the contrary in the charter or by-laws, a majority will constitute a quorum, and a majority of that quorum can do the business of the board.—Morawetz Corporations, §§ 467, 531. The fact that plaintiff was present at this meeting will not alter the rule. He abstained from voting for the reason that he could not vote on the question, and the proceedings will be given the same effect as if he had been absent.''

In *Ex parte Willcocks,* 7 Cowen 402, it is also said:

''To make a quorum of a select and definite body of men possessing the power to elect, a majority at least must be present; and then a majority of the quorum may decide.''

In *Wells v. The Rahway White Rubber Co. et al.,* 19 N. J. Equity 404, it was said:

''At this meeting, three of the five directors were present, and although there is some proof that the entry is incorrect in stating that all three concurred in the resolution, yet it appears that two did

concur unconditionally, and as of five directors three are a quorum, and two a majority of the three, the resolution must be taken as valid and binding.''

In view of these authorities and others of similar import, we adopt the rule that where the board of directors of a corporation consists of five members and, under the by-laws, it requires four to constitute a quorum, a majority of the quorum, being a majority of the board, can legally do any act which the entire board would be authorized to do.

In the findings of the trial court some importance appears to have been given to the fact that Director Orman received no notice of the meeting of the board of directors to be held upon the 7th of May, and in the oral argument counsel for plaintiff urged that as one of the reasons why this meeting was illegally held. It is undisputed that this was a regular meeting. In that event the members of the board were bound to take notice of it and it was unnecessary to notify them.

The second contention of appellant is that the $8,000.00 note was made without consideration and was practically a gift to defendant Wallace. Appellant contends that the evidence as to the alleged services for which the $8,000.00 was allowed falls far short of showing that they were outside of the line of his duty as an officer and director of the company. There is no evidence that the president or any of the members of the board of directors was bound to perform any duties in addition to those usually performed by like officers in similar corporations. Without attempting to enumerate the ordinary duties of such officers, it is sufficient to say that the services performed by defendant Wallace were largely in excess of those which he was bound to perform as an officer of the corporation. It appears from the testimony that Wallace spent a great

deal of time and rendered valuable services to the company; that he saved the company's entire property from being sold under execution and under decrees to satisfy miners' and mechanics' liens; that he undertook the placing of the stock of the company; that he assumed the entire supervision of the tunnel work and disbursement of the funds; the employment of men and the making of contracts. His services differed from the other officers of the company in that he devoted almost his entire time for a portion of each year to the financing and management of the corporation affairs. He was put to much expense in railroad and traveling expense. He gave of his stock to others and secured their assistance, including the 3,750 shares presented to plaintiff.

Obviously, therefore, under the testimony, the services which the plaintiff performed were not those of a director or president, but outside thereof and similar to those of a general manager.—*Corinne Mill, Canal & Stock Co. v. Toponce,* 152 U. S. 405.

In *Ruby Chief M. & M. Co. v. Prentice,* 25 Colo. 4, it was said:

"Under the later and better reasoned cases, for such services (that is, services performed by a director clearly outside of his duties as such director and in the nature of the duties of a general manager or superintendent) a recovery may be had either under an express or implied contract.    *    *    *

"In *Brown v. Silver Mines,* 17 Colo. 421, there was no occasion to announce the rule that should govern in this jurisdiction, nor, as a matter of fact, was there any such ruling. In the absence of a controlling precedent of our own, it is a salutary general rule to follow the decision of the supreme court of the United States. For services clearly outside the director's duties, as a director, we think

there may be a recovery, as upon *quantum meruit*, under and in accordance with what, in *Brown v. Silver Mines, supra,* is denominated the 'more liberal rule.' "

The testimony clearly showing that the duties performed by Wallace were in addition to those which he was required to perform as the president or a director of the corporation, he is entitled to compensation therefor, and the court erred in enjoining the collection of so much of the judgment as was based upon the $8,000.00 note.

The third attack made upon the judgment of the trial court by the plaintiff is that the court erred in not also setting aside the portion of the judgment which was based upon the promissory notes other than the $8,000.00 note. These notes were made by Wallace and the secretary, as the act of the corporation, without direct authorization by the board of directors. They were given on account of moneys loaned to the company by Wallace, or disbursed by him for the use and benefit of the company. The members of the company had notice of it, the corporation used the money and received all of the benefit of the transaction. The execution of the notes did not create an indebtedness, but was simply evidence of the existence of the indebtedness made by the moneys loaned and advanced by Wallace. By their action at the meeting of May 7th, the board of directors ratified the action of the president and secretary in the execution of these notes. This they had the power and authority to do.

This brings us to the consideration of the action of Robinson and Wallace in extending the time for the purchase of the stock and the reducing of the price to be paid therefor. It is unnecessary for us to pass upon the question as to whether or not this was properly done, for the reason that the stock held

by plaintiff was acquired from Wallace after the transaction complained of had been accomplished, and was a portion of the very stock which he complains was illegally sold to defendant Wallace. He cannot partake of the fruits of the fraud, if fraud there was, and be heard to complain that it was tainted. In speaking of this subject, in 1st Cook on Stock and Stockholders, at § 40, it is said:

"Not only the participating and acquiescing stockholders, but also their transferees, are bound by the participation or acquiescence. The transferee cannot claim to have greater rights than his transferrer, as regards a general remedy invalidating the whole transaction. He cannot bring suit in behalf of the corporation and other stockholders against the party or parties participating in the issue, inasmuch as his own title is tainted with the same fraud. Nor can he bring an action against the corporation."

In support of this proposition there are many authorities cited by the author, and it seems to be the settled doctrine. The only error we perceive in the record is that committed by the court in canceling so much of the judgment of Wallace against the corporation as was based upon the $8,000.00 note. This was prejudicial to the defendant Wallace, and for that reason the judgment must be reversed. In all other matters it is affirmed.          *Reversed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE GODDARD concur.