## PACIFIC AMERICAN GASOLINE CO. OF TEXAS et al. v. MILLER et al.

### No. 4266.

Court of Civil Appeals of Texas. Amarillo.

Oct. 15, 1934.

Rehearing Denied Nov. 26, 1934.

See, also, 61 S.W.(2d) 1024; 74 S.W.(2d) 720.

Otis Trulove and L. M. Fischer, both of Amarillo, Lyndsay D. Hawkins, of Breckenridge, and Walter David, of Borger, for appellants.

Weeks, Morrow & Francis, of Wichita, Falls, and Morgan, Culton, Morgan & Britain, of Amarillo, for appellees.

MARTIN, Justice.

This foreword, because of the great size and unusual character of the record: The appellees are holders of notes of approximately $140,000 in amount. The appellants are the Pacific American Gasoline Company of Texas (called herein the Gasoline Company), the J. M. Huber Petroleum Company (called herein the Petroleum Company), the J. M. Huber Company of Louisiana, Inc. (called herein the Carbon Company), and R. C. Ware, trustee. Of the appellants named the first is a domestic corporation, the second a Delaware corporation, and the third a Louisiana corporation. Their interrelation is stated hereafter, and as well also as their respective interests in the subject-matter of the present litigation.

Suit was brought in the district court of Potter county by appellees for the interest on so-called "gold notes" issued by said Pacific American Gasoline Company of Texas. Other relief was asked, the nature of which will later appear herein.

The trial court peremptorily instructed the jury against appellants and entered the judgment hereafter shown.

■ One of the major legal questions presented for our determination is that arising from appellants' contention that all of said notes are void, in that they represent a "fictitious indebtedness" created in contravention to the terms of article 12, § 6, of our state Constitution, which reads as follows: "No corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void."

This compels us to make a lengthy and involved statement of the facts which surround the note issue in question, including the reproduction verbatim of several written documents which vitally affect the questions decided by us.

In 1928 the Southwestern Engineering Corporation of California, and the Caltex Syndicate, an unincorporated partnership, owned or had claims against properties in Hutchinson county, Tex. Their investment in these amounted to some $250,000. They consisted of a casing-head gasoline plant, certain casing-head gas contracts, and other oil and gas properties nearby. Their investment at this time was not remunerative, and they were desirous of either disposing of these properties or of making them produce an income. To this end negotiations were begun with Masten and others of California. Masten was a highly efficient executive, and had been unusually successful in the production and sale of casing-head gasoline. The negotiations resulted in the execution of the following preliminary agreement:

"This agreement made and entered into by and between F. E. Keeler, F. B. Ansted and B. F. Masten, Trustees, and others, all of Los Angeles, California, parties of the first part, and the Southwestern Engineering Corporation, a California corporation, party of the second part, and H. Schwartz and Edward Thornton, both of Los Angeles, California, parties of the third part, Witnesseth:

"Whereas, the parties of the third part have and hold certain leases covering the right to take and treat casinghead gas, all of which leases are located near Borger, Texas, and cover approximately one-hundred-eighty (180) acres of land and have a gas volume of approximately 1000,000,000 cu. ft. daily, a list of which leases is attached hereto marked Exhibit 'A' and expect to acquire additional leases in the same locality, and

"Whereas, the party of the second part has certain plants known as Absorption Plants located at Borger, Texas, and consisting of one No. 75 Southwestern Absorption Plant, four No. 25 Southwestern Absorption Plants, together with laboratory, boilers, storage tanks, lines, all as now located at Borger, Texas, and in addition thereto the said party of the second part is now erecting and constructing one Type 100 Southwestern Absorption Plant on the Deal Lease near Borger, Texas, acting under the instructions of the said parties of the first part for themselves and associates, and

"Whereas, the parties of the first part have pledged to them the sum of One Hundred Fifty Thousand Dollars ($150,000.00) which sum is being furnished by the said parties of the first part and their associates, and

"Whereas, it is mutually desired and agreed that all of the parties hereto enter into and organize a corporation under the laws of Nevada or some other state suitable to the parties, which corporation shall have and hold all of the properties herein described

free and clear from any and all incumbrances whatsoever,

. "Now, therefore, it is mutually understood and agreed as follows:

"That a corporation shall be organized by the parties herein under the laws of the State of Nevada having a Common capital stock of $1,000,000.00 divided into 1,000,000 shares of the par value of $1.00 each, which stock shall be non-assessable.

"That said corporation shall have a Board of seven directors, consisting of the following: F. E. Keeler, Thomas W. Warner, F. B. Lewis, B. F. Masten, F. B. Ansted, Roger L. Dennis, Royal Bush.

"That said corporation shall issue in addition to the 1,000,000 shares of stock above mentioned, notes and/or debentures which shall be a first lien upon all of the property and assets described in this agreement to the amount of $350,000.00, bearing interest at the rate of 7% per annum, payable quarterly, commencing January 1, 1929. Said gold notes and/or debentures shall be a first lien upon all of the property, assets and holdings of the said corporation, and particularly upon the leases, plants and other property herein described, payable on or before three (3) years from January 1st, 1929, and shall be callable at any interest date, upon the giving of thirty (30) days written notice, at par plus accrued interest to the date of such call; provided, however, that no call shall be made for the retirement of said notes excepting in the amount of at least 10% or multiples thereof of the notes then outstanding, and if a call is made between any interest dates the interest shall be paid upon the notes called to the next paying period.

"It is the plan to retire these notes at the earliest possible moment consistent with a sound financial policy; and further it is understood and agreed that there is to be no dividends declared or paid on any of the Common capital stock of the corporation while any of these notes in whole or in part are outstanding.

"It is further agreed that there is to be no directors or executives salaries, excepting the salary of the Vice-President and Manager of operations while these notes are outstanding, to the end that all items of overhead, excepting productive operatives shall be kept to the very minimum during the period that these notes are outstanding.

"It is further understood and agreed that until such time as the corporation has been perfected in all of its details and has received complete title to all of the property, free and clear from all incumbrances whatsoever. and that such trustees shall be Fred E. Keeler, Ben F. Masten and Frank B. Ansted. That any two of such trustees must sign checks for any disbursements from the funds of their trustee account, as well as requisitions for any work, labor or material ordered, and for any and all other items of expenditure in connection with this trust. Such trustees to give adequate bond for any and all funds and/or property ·coming into their hands or control during the period ·of such trust.

"The ·parties of the third part are immediately to transfer to the trustees designated, the leases now outstanding in their respective names and later the party of the second· part, Southwestern Engineering Corporation, is to deliver· by bill of sale or proper transfer of title, free and clear from all incumbrances whatsoever, the five absorption plants now located on said leases at Borger, Texas, together with laboratory, boilers, storage ·tanks, lines, and every item whatsoever now connected with their operations. ·

"The parties of the first part for themselves and associates having pledged the sum of $150,000.00, the same is to be made available in cash to the trustees and/or the corporation in the following amounts: 30%, or $45,000.00 on the 10th day of October, 1928, 40%, or $60,000.00, on the 10th day of November, 1928, 30%, or $45,000.00, on the 10th day of December, 1928.

"The said sum of $150,000.00 or whatever sum shall remain after having expended the amount necessary for the installation of Type 100 Plant now being installed on the Deal lease, and in the possible moving of the other plants now located at Borger, Texas, from their present location to and upon the most important of the leaseholds ̍herein described, plus any other amount that has been properly expended in the management and operation of the business herein outlined, such sums so remaining will be delivered to the corporation as an operating fund and for the further capital requirements of the Treasury of the corporation to be later organized.

"The trustees, upon having fully carried out the terms of this agreement, having delivered all the leases, equipment, plants, properties, accounts, cash, etc., to the corporation, will have received in exchange therefor and in consideration of such transfers, as fully paid for, 1,000,000 shares of Common Capital Stock and $350,000.00 in Gold Notes, which same shall be distributed as follows:

"Gold Notes and/or debentures of the par value of $150,000.00 and 600,000 shares of

Common stock to the parties of the first part, their associates and/or order. ·

"Gold Notes and/or debentures of the par value of $200,000.00 and 400,000 shares of the Common stock to the parties of the second and third part and/or their order.

"That as the properties and plants are all located in Texas it is agreed that the corporation herein referred to, and which shall be known as the Pacific American Gasoline Company shall either qualify in Texas, or a Texas corporation of the same name with a nominal capital shall be organized; the entire capital stock of said Texas corporation to be held by the Nevada Corporation.

"All other things necessary in order to comply with the tenor of this agreement shall be done in order that this agreement may be fully effectuated."

This contract was subsequently modified in respect to matters which we hereafter set out. Masten assumed charge, pending the issuance of charters to the contemplated corporations. A new plant was installed and operations began about December 1, 1928. A short time thereafter a valuable contract was secured from appellant J. M. Huber Company of Louisiana for the purchase by it from Masten et al. of the "residue" or "dry" gas, a product remaining after gasoline has been extracted from casing-head gas. It is used in the manufacture of "carbon black." Almost immediately thereafter the said company erected at a large cost a carbon black plant nearby the property being managed by Masten. In January, 1929, a charter was issued to the Pacific American Gasoline Company of Texas. Its capital stock was $150,-000, all of which was paid in cash by California parties. Thereafter the property of the Caltex Syndicate and others was conveyed to the above corporation and placed on its books, and contemporaneously therewith the $350,000 in "gold notes" were issued. These were in denominations of $1,000 each, and are identical in their terms. A verbatim copy of one of these is as follows:

"United States of America

"Organized Under the Laws of the State of Texas.

"No. M 301                                    $1,000
"$1,000    Pacific American Gasoline    $1,000
                Company of Texas

"Seven Per Cent Gold Note

"Pacific American Gasoline Company of Texas, a corporation organized and existing under the laws of the State of Texas, and hereinafter referred to as the Company, for value received, hereby promises to pay to the bearer hereof one thousand dollars ($1,000.-00) in gold coin of the United States of America or equivalent to the present standard of weight and fineness, on the first day of January, 1934, at the main office of Security First National Bank of Los Angeles, in the City of Los Angeles, California, and to pay interest thereon from January 1, 1929 until paid, at the rate of seven per cent (7%) per annum, payable quarterly in like gold coin on the first day of January, on the first day of April, on the first day of July, and on the first day of October of each year, at the main office of Security-First National Bank of Los Angeles, in the City of Los Angeles, California, in accordance with and on presentation and surrender of the interest coupons hereto annexed as they severally become due, without deduction from either principal or interest of any taxes or governmental charges, except taxes on gifts or inheritance and any excess of income tax or taxes over two per cent (2%) that the Company may be required or permitted to pay thereon or retain or deduct therefrom under any present or future law of the United States of America.

"This note is one of an issue known as Pacific American Gasoline Company of Texas Seven Per Cent Gold Notes, all of like date, tenor and maturity except the variations necessary to express their number and denomination, three hundred twenty-seven (327) of said notes to be of denomination of One Thousand Dollars ($1,000.00) each, numbered M–1 to M–327, both inclusive, twenty-eight (28) of said notes to be of the denomination of Five Hundred Dollars ($500.00) each, numbered from D–1 to D–28 both inclusive, and ninety (90) of said notes to be of the denomination of One Hundred Dollars ($100.00) each, numbered from C–1 to C–90, both inclusive.

"All or any of the notes of this issue are at any time payable at par, together with interest to the next succeeding interest date provided thirty (30) days written notice of such payment is given the holder thereof (any notice so given to stop the further running of interest on this note from thirty (30) days from the giving of such notice to the holder hereof).

"The Company agrees that in the event it redeems less than all of the outstanding notes of this issue, such redemption shall in all cases be determined by the Company by lot or pro rata in the discretion of the Board of Directors of the Company at the time of the call for redemption of such notes.

"The Company further agrees that it will pay no dividends of any kind or character upon its capital stock until all of the gold notes of this issue are paid off and discharged; also that no sale of the entire assets of the Company will be made, and/or that no funded indebtedness of the Company will be created without the consent of the holders of eighty (80%) per cent of the principal amount of all gold notes of this issue then outstanding, until all of the gold notes of this issue are paid off and discharged.

"No recourse shall be had for payment of any part of the principal or interest of this note against any incorporator, or any present or future stockholder of the Company, either directly or through the Company, by virtue of any law or by enforcement of any assessment or otherwise, or against any officer or director of the Company by reason of any matter prior to the delivery of this note or against any present or future officer or director of the Company, except for his own wrongdoing; all such liability being, by the acceptance hereof and as a part of the consideration for the issue hereof, expressly released.

"In witness whereof, the said Company has caused this note to be signed by its Vice-President, and its corporate seal to be hereunto affixed and attested by its Secretary, and coupons for such interest, bearing the engraved facsimile signature of its Treasurer, to be attached hereto at Borger, Texas, this twenty-fifth day of March, 1929.

"Pacific American Gasoline Company of Texas

"By B. F. Masten, Vice-President.
"Attest:
"Frank B. Ansted."

The note and stock issue was then divided among the stockholders in precise accordance with the preorganization agreement set out above. There were no general creditors then or thereafter. The concern began to make money from the start. The "residue" or "dry" gas contract yielded it $15,000 per month gross. It was, in part, as follows:

"That, whereas, the Seller is the owner of a certain gasoline extraction plant, free of liens, which is located in Section 28 of Block Y in Hutchinson County, Texas; and,

"Whereas, the Seller, in connection with said gasoline plant is now the owner of certain gas contracts and contemplates obtaining other gas contracts whereby natural gas is and will be obtained for the purpose of extracting gasoline therefrom in said gasoline plant; and,

"Whereas, the Buyer proposes to erect at some convenient place near said gasoline plant a carbon black plant for the purpose of burning a portion or all of the residue gas from said gasoline plant in the manufacture of carbon black or other products of gas.

"Now, therefore, in consideration of the premises and of the terms and conditions and covenants hereinafter contained, the parties hereto agree as follows:

## "1. Volume

"The Buyer agrees to buy and receive at the meters hereinafter provided for which shall be installed near Buyer's plant, and the Seller agrees to sell and deliver to the Buyer at said meters a minimum of 25 million cubic feet of residue gas of like kind and quality hereinafter specified in paragraph number Two per twenty-four hour day, as averaged over each calendar month, and a maximum volume equal to the total capacity of Buyer's plant or any addition thereto if available to be used in the manufacture of carbon black and for any other purposes at a minimum pressure of Twenty (20) pounds per square inch gauge pressure into Buyer's pipeline. Delivery of gas hereunder shall begin as soon as Buyer's plant is finally completed. * * *

## "5. Price

"The Buyer hereby covenants and agrees to pay to Seller for all of the gas delivered by the Seller, and accepted by the Buyer hereunder from and after the completion of Buyer's carbon black plant and up to the first day of July, 1931, the sum of one and one-half (1½) cents per thousand cubic feet and beginning with the first day of July, 1931, and extending to the first day of July, 1934, the price shall be one and three-fourths (1¾) cents per thousand cubic feet and for the next succeeding two (2) years the price shall be Two (2) cents per thousand cubic feet and thereafter the price shall be one and three-fourths (1¾) cents per thousand cubic feet, said payments to be made by the Buyer to the Seller on or before the 20th day of each calendar month for gas so sold and delivered during the preceding calendar month."

This concern was operated from December, 1929, to May 17, 1930, when it was sold under the following contract:

"This agreement made and entered into this the 17th day of May, A. D., 1930, by and between Pacific American Gasoline Co. of Nevada, a corporation duly organized under the laws of Nevada, the original charter for which was issued on or about the 10th day of

December, A. D. 1928, for one million (1,000,-000) shares, no par or nominal value, of stock, which charter was later amended, to-wit, the 11th day of April, A. D. 1929, so as to make the capital stock one million (1,000,000) shares of a par value of One Dollar each, said corporation acting by and through B. F. Masten and R. L. Dennis, who have been duly constituted as the agents and attorneys-in-fact for said corporation, hereinafter called First Party, and J. M. Huber Petroleum Co., a corporation organized under the laws of Delaware, with an office in Hutchinson County, Texas; hereinafter called Second Party, Witnesseth:

"That, whereas, the principal asset of First Party consists of all of the capital stock of Pacific American Gasoline Company of Texas, a corporation, duly organized under the laws of Texas, with a capital stock of fifteen thousand (15,000) shares of a par value of Ten Dollars ($10.00) per share, which has heretofore been fully subscribed and paid, the assets of said Texas corporation consisting principally of a gasoline plant and equipment located in Hutchinson County, Texas, and other assets as reflected by the financial statement of said Texas corporation, dated April 30, 1930, which is attached hereto and referred to for all purposes;

"Now, therefore, this agreement:

"First party has this day duly endorsed and transferred to Second Party all of the shares or certificates of capital stock of the said Pacific American Gasoline Company of Texas, and agrees to promptly deliver to second party all of the books, records, files, papers, documents and abstracts, as well as all real and personal property, of every nature whatsoever, belonging to the said Pacific American Gasoline Company of Texas, it being the intention and purpose to transfer all of the capital stock of said corporation, and along with it all of the assets of said Texas corporation, to second party, save and except the following items:

"(a) Promissory note of Belltone Pictures Equipment, for $5,250.00;

"(b) The account of Pacific American Gasoline Company of Nevada, in the amount of $2,152.32;

"(c) One-half of the stock in Western National Gasoline Company, in the amount of $3,000.00; and

"(d) Certain office fixtures and desks located in Los Angeles, California.

"It is mutually understood that the Pacific American Gasoline Company of Texas has heretofore issued, and there is now outstanding, gold notes in the total amount of Three Hundred Fifty Thousand Dollars ($350,000.-00), bearing interest at the rate of seven per cent (7%) per annum, payable quarterly, and maturing on the first day of January, 1934, which said notes are to a large extent now owned by the stockholders of the first party, and that Pacific American Gasoline Company of Texas has a certain contract with J. M. Huber Company of Louisiana, Incorporated, for the sale of certain residue gas, to be used in the manufacture of carbon black.

"In consideration of the transfer by First Party of the stock and assets hereinabove described, second party hereby promises and agrees to promptly file articles of amendment to its charter so as to provide for one and one-half million (1,500,000) shares of common no par voting stock, it being understood that the 4,000 shares of 7% preferred, $100.00 par stock which was authorized in the original charter shall remain the same; that as soon as said charter is so amended and certificate is issued therefor, Second Party will promptly cause said common stock to be issued as follows:—Two hundred thousand (200,000) shares to first party or order, one million (1,-000,000) shares to the present holders of the common stock of second party, and three hundred thousand (300,000) shares to remain in the treasury.

"It is mutually agreed that the certificates of stock issued to First Party shall contain a proviso to the effect that the President or Vice-President of J. M. Huber Company of Louisiana, Incorporated, or its successors, shall have the exclusive power and authority to vote said stock as he shall see fit for a period of five (5) years from date of issuance of said stock, it being the intention and purpose to give to J. M. Huber Company of Louisiana, Incorporated, the exclusive right to control the business policies of J. M. Huber Petroleum Co., for said periods of time.

"First Party will promptly furnish resignations of all present officers of the Texas corporation and cause to be signed all necessary checks, papers and vouchers, and cause to be delivered to second party all cash on hand and on deposit belonging to the Texas corporation.

"It is further mutually agreed that second party will operate the business of the Pacific-American Gasoline Company of Texas along the same general lines that it is now operated to the end that its contract with J. M. Huber Company of Louisiana, Incorporated, will be fully performed, so that the earnings of said

gasoline company will be sufficient to liquidate said outstanding gold notes above mentioned. In other words, second party agrees to operate said gasoline plant in a good-faith effort to liquidate said indebtedness, making such repairs and improvements only as the earnings of said gasoline company justify, having in mind at all times due regard to the liquidation of the gold notes hereinabove mentioned. In this connection, it is understood that second party is now the owner of considerable gas and gas acreage in what is known as the Pantex area in Hutchinson County, Texas, and that it will, if necessary for the continued operation of said gasoline plant, place any gas that is then available from said wells on said leases at the disposal of said gasoline plant, on the same terms and provisions as is then being paid for gas of like kind and quality by other gasoline operators in that particular field.

"It is mutually understood that all taxes due and owing by said Pacific American Gasoline Company of Texas, except the current state and county taxes for the year 1930, in the state of Texas, have been fully paid, and that all properties are free and clear of liens.

"In witness whereof, this instrument has been executed at Amarillo, Texas, this the 17th day of May, A. D. 1930.

> "Pacific American Gasoline Company of
> Nevada
> "By B. F. Masten, Vice-President
> "R. L. Dennis, Ass't. Sec'y.
> "Its Agents and Attorneys.

"Witness:
> "E. R. Liner
> "J. M. Huber Petroleum Company
> "By Walter David, President.

"Witness:
> "E. R. Liner."

During its operation of approximately seventeen months, it earned, net, the sum of $67,221.63. The last month of its operation, April, 1930, its net earnings were $10,513.50.

It will be noted that the Pacific American Gasoline Company of Texas issued stock in the amount of $150,000 and later the "gold notes" amounting to $350,000, making a total of $500,000 of liabilities. It possessed assets to support these substantially as follows: $150,000 in cash or its equivalent, certain casing-head gas contracts and leasehold interests, casing-head gas plants, two of which they sold for $37,500, profits of $5,426.87, made prior to its incorporation, contract for the sale of its gasoline, and the "dry gas" contract copied above, which was producing about $7,500 per month, net, with prospects of an increase, and which actually did materially increase before its business was sold in May, 1930, to one of the appellants herein. Lastly, it possessed an intangible asset as a going concern with a promise of a prosperous future, not possessed by those it absorbed. Appellants here assert that there was nothing substantial back of the note issue in question, and sought in the trial court to establish this fact by proof of the comparatively worthless value of the separate properties assembled by the promoters of said corporation and which they assert constituted, in the main, its assets, aside from the $150,000 in cash which supported the stock issue. Eliminating the last item, it seems to be their claim that comparatively nothing is left which justified or authorized the issuance of the notes in question. Their reasoning proceeds so far as to say that any stock or bond issue of a corporation, unsupported by property of a value equal to the face value of such stocks and bonds, constitutes a "fictitious indebtedness," in violation of our constitutional provision above quoted. In the present case there were no creditors. The original stockholders apparently dealt with each other at arm's length, and themselves placed a value upon the property behind the note issue under attack. A group of these stockholders paid in cash $150,000 into the assets of said corporation. The preorganization contract was carried out exactly as stipulated by all the original stockholders and organizers. None other were involved. No fraud or deceit such as would give rise to a common-law action was shown in the organization of same or the issuance of said notes. There is no basis for any claim of lack of good faith, or an attempted evasion of the law, further than what might be implied from the asserted overvaluation of the original properties assembled by said parties, and which ultimately were conveyed to the corporation about the time of said note issue. One of the appellants herein was the purchaser and transferee of said stock and secured every contract or legal right it has to said properties by virtue of its said purchase.

We are not able to agree with appellants' contention that under the above facts the said note issue was a fictitious indebtedness, and therefore void. Nor does any well-considered case examined by us support it.

The Supreme Court of the United States has construed a constitutional provision of the state of Arkansas (article 12, § 8) precisely identical with our own. We quote:

"That section provides that 'no private corporation shall issue stocks or bonds, except

for money or property actually received, or labor done, and all fictitious increase of stock or indebtedness shall be void.' In support of this view, our attention is called to the fact, admitted by the demurrer, that the full value of the property, rights, and privileges conveyed to appellant did not exceed $1,300,000, the amount at which the capital stock was fixed; and, consequently, it is argued, the $2,600,000 of bonds were issued without any consideration received in money, property, or labor, and represented only a fictitious indebtedness. In other words, appellant's vendors were fully compensated for their interests by taking to themselves its entire stock.

"We do not concur in this view of the case. It does not, we think, rest upon a sound interpretation of the state constitution. The prohibition against the issuing of stock or bonds, except for money or property actually received or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. * * *'

"Recurring to the language employed in the Arkansas constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. * * *

"Under these circumstances, it cannot be fairly said that the bonds secured by the mortgage were issued without any consideration whatever actually received in property." Memphis & Little Rock Railroad Company v. Robert K. Dow et al., 120 U. S. 287, 7 S. Ct. 482, 487, 30 L. Ed. 600.

"Stock issued and disposed of for a valid consideration is not fictitious, within the provision quoted. The language is not that all stock sold for less than its face value shall be void, but that 'all fictitious increase of stock shall be void.'" Judge Williams in Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1015, 1022.

See, also, Smith v. Ideal Laundry Co. (Tex. Civ. App.) 286 S. W. 285; Stein v. Howard, 65 Cal. 616, 4 P. 662; 14 C. J. pp. 405 and 447; Furr v. Chapman (Tex. Com. App.) 286 S. W. 171, and authorities there collated.

In the present case, the evidence is conclusive that a very substantial consideration existed for the issuance of the notes in question. If in determining this question the courts may properly examine, as we think they can, present and prospective earning capacity, we have here property capable of earning a high rate of income per annum on $500,000, fully sufficient to justify the conclusion that its value was equal to the amount of the stock and note issue. But, if there could be doubt as to this, there can be none of the rule that stockholders who participate in such transaction and their transferees cannot raise the question of an inadequate consideration or overvaluation of property received in consideration of a note or bond issue. Here the notes under attack were issued with unanimous consent of all stockholders. All of them participated. No third party was injured. The contract of purchase quoted above and the evidence conclusively show that an appellant now complaining was the transferee of this stock and would be relieved from the performance of its contract to its pecuniary benefit in a large sum if it be allowed to question the constitutionality of such note issue upon the grounds stated. It stands in the shoes of its transferor with respect to this transaction. Plainly the stockholder who acquiesced therein, and actively participated in the issuance of these, cannot now be heard to say that the consideration received was not equal to the face value of the note.

The principle of law governing this is well settled.

"Not only the participating and acquiescing stockholders, but also their transferees, are bound by participation and acquiescence. The transferee cannot claim to have greater rights than his transferor as regards a general remedy invalidating the whole transaction. He cannot bring suit in behalf of the corporation and other stockholders against a party or parties participating in the issue." Cook on Corporations (8th Ed.) § 48.

"The purchaser of stock in a corporation is not allowed to attack the acts and management of the company prior to the acquisition of his stock; otherwise, we might have a case where stock duly represented in a corporation consented to and participated in bad management and waste, and, after reaping the benefits from such transactions, could be easily passed into the hands of a subsequent purchaser, who could make his harvest by appearing and contesting the very acts and conduct which his vendor had consented

to." United Electric Securities Co. v. Louisiana Electric L. Co. (C. C.) 68 F. 673, 675.

"Every stockholder of the new corporation assented to this transaction, and the directors authorized, approved, and ratified it. * * * In the absence of fraud, as far as the stockholders or their assignees are concerned, the action of the directors in issuing it is final, and the action of the corporation cannot be attacked by the stockholders, or the validity of the issue assailed on the ground, merely, that the consideration was inadequate for which the corporation issued it as fully paid up. Creditors may attack the transaction; stockholders cannot." O'Dea v. Hollywood Cemetery Ass'n, 154 Cal. 53, 97 P. 1, 6.

"It is elementary that by the unanimous consent of all stockholders a solvent corporation may make any disposition of the company assets they desire, in the absence of fraud upon creditors. Cook on Corporations (6th Ed.) § 730; Great Western M. & M. Co. v. Harris, 128 F. 321, 63 C. C. A. 51. A corporation has no such separate entity as will permit it to act counter to the unanimous desire of its stockholders. * * * By participation in the transaction the shareholders are estopped to deny its legality, and the corporate entity cannot act for them. Home Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 Am. St. Rep. 716.

"The entire body of stockholders acquiesced and participated in the transaction. They are accordingly bound by it, and their transferees are also bound. In. Gumaer v. Cripple Creek Tunnel, Transportation & Mining Co., 40 Colo. 1, at page 17, 90 P. 81, at page 86, 122 Am. St. Rep. 1024, 13 Ann. Cas. 781, this court in speaking to this question said:

" 'Not only the participating and acquiescing stockholders, but also their transferees, are bound by the participation or acquiescence. The transferee cannot claim to have greater rights than his transferor as regards a general remedy invalidating the whole transaction. He cannot bring suit in behalf of the corporation and other stockholders against the party or parties participating in the issue, inasmuch as his own title is tainted with the same fraud. Nor can he bring an action against the corporation.' " Pueblo Foundry & Machine Co. v. Lannon, 68 Colo. 131, 187 P. 1031, 1032, by the Supreme Court of Colorado.

"Issuance of stock at overvaluation is illegal as against dissenting stockholders and creditors. A transferee of stock in any corporation stands in the same position as the transferor with respect to the right to complain of the issuance of watered or fictitiously paid up stock, and is therefore estopped to complain if its transferor is estopped." Thompson on Corporations, § 4004.

The trial court peremptorily instructed the jury at the conclusion of the evidence to return a verdict for appellees. This action is vigorously attacked as error upon many grounds. The controlling ones are:

That the evidence at least presented an issue of fraud in the inception of the gold notes, which, if found to exist, constituted a defense barring their collection, because: (1) They are nonnegotiable; and, if not, (2) the holders had actual notice of such fraud; (3) an issue of negligible consideration existed, so that recovery, if any, should be reduced pro tanto.

It is further insisted that whatever rights the gold note holders had in the contract of May 17, 1930, quoted above, were annulled and canceled by a subsequent contract entered into November 7, 1931, between the original parties to the May 17th contract and certain gold note holders, and before any of the appellees had acted upon said May 17th contract.

There is the related question also presented of certain fraud alleged to have been perpetrated by the Gasoline Company and its officers and agents upon appellant Petroleum Company in the sale of its assets and stock at the time of and prior to the execution of the May 17, 1930, contract, quoted above, which gave to the purchaser a common-law action for fraud and deceit.

These questions have in most part the same background, and for brevity have been stated together, as a discussion of each will in some measure apply to most of the others.

■■ As to the first two contentions above, what has already been said of the original organization of the corporation and the issuance of the gold notes shows clearly that no legal fraud accompanied either, at least of which appellants may complain. Their contention of fraud in the inception of the note issue is bottomed mainly upon the showing that they were originally issued to the stockholders themselves, and were allegedly without sufficient consideration. Where no third party is injured, bonds of a corporation may be issued for the benefit of its individual stockholders. Their issuance under such circumstances is not a badge of fraud. 14 C. J. pp. 405 and 441; Pueblo Foundry & Machine Co. v. Lannon, 68 Colo. 131, 187 P. 1031.

Their issuance for an inadequate consideration is binding upon the corporation, the participating stockholders and their transferees. 14 C. J. pp. 452, 454, and authorities supra. The effect of these holdings is adverse to appellants' first three contentions above.

Before proceeding further, it is well to here sketch briefly a picture of the situation as it existed on and after the sale of the assets of the Gasoline Company to the Petroleum Company on May 17, 1930, which furnished the occasion for the present controversy. In 1928 certain parties had unprofitable investments in Hutchinson county, consisting, in the main, of oil and gas properties and a casing-head gasoline plant. A corporation was formed to take over, reorganize, and operate these; $150,000 in cash was paid in, constituting the capital structure of said corporation, and 1,500 shares of the par value of $10 each in said corporation were issued to its organizers. Thereafter the above properties were conveyed to said corporation, and contemporaneously therewith the gold notes in controversy were issued; the notes going to the stockholders in the proportion set out above. The above corporation was the Pacific American Gasoline Company, whose stock was owned by the Pacific American Gasoline Company of Nevada. The latter stock was likewise divided as per contract quoted. ·The Texas corporation was under efficient management and had already begun to make money on the date of the note issue. The preorganization contract provided for a lien as security for the gold notes. Influenced undoubtedly by a bright prospect for the future, this security was waived and the following inserted in the face of the gold notes in lieu thereof:

"The Company agrees that in the event it redeems less than all of the outstanding notes of this issue, such redemption shall in all cases be determined by the Company by lot or pro rata in the discretion of the Board of Directors of the Company at the time of the call for redemption of such notes.

"The Company further agrees that it will pay no dividends of any kind or character upon its capital stock until all of the gold notes of this issue are paid off and discharged; also that no sale of the entire assets of the Company will be made, and/or that no funded indebtedness of the Company will be created without the consent of the holders of Eighty (80%) per cent. of the principal amount of all gold notes of this issue then outstanding, until all of the gold notes of this issue are paid off and discharged."

At this time it appeared certain that the "dry gas" contract with the Petroleum Company, one of the appellants herein, if performed as written, would alone pay this entire gold note issue. ·The entire assets of the Gasoline Company became the property of the Petroleum Company on May 17, 1930, and on June 6, 1930, the president of the Petroleum Company wrote to one of its directors in part:

"I succeeded in closing the deal with the Pacific American Gasoline Company, whereby we acquired all of their stock and agreed to increase our capital to 150,000 shares of our no par common voting stock for all of the stock of the Pacific-American.

"The Pacific-American Gasoline Company have outstanding gold notes in the total amount of $350,000.00, bearing 7%, quarterly, and due January 1, 1934. In addition, they have current liabilities of approximately $50,000.00, and ·current assets of approximately $50,000.00. For the month of May, apparently their earnings are approximately $10,000.00 net. I believe, from the way it now stands, that the plant will·pay off the notes and make needed repairs and additions, by the time the notes are due, leaving us the plant free and clear by approximately January 1, 1934. I believe the plant is worth at least half a million dollars as it now stands."

The May 17th contract contained the following stipulations:

"It is mutually understood that the Pacific-American Gasoline ' Company of Texas has heretofore issued, and there is now outstanding, gold notes in the total amount of Three Hundred Fifty Thousand Dollars ($350,000.00), bearing interest at the rate of seven per cent (7%) per annum, payable quarterly, and maturing on the first day of January, 1934, which said notes are to a large extent now owned by the stockholders of First Party, and that Pacific-American Gasoline Company of Texas has a certain contract with J. M. Huber Company of Louisiana, Incorporated, for the sale of certain residue gas, to be used in the manufacture of carbon black. * * *

"It is further mutually agreed that Second Party will operate the business of the Pacific-American Gasoline Company of Texas along the same general lines that it is now operated, to the end that its contract with J. M. Huber Company of Louisiana, Incorporated, will be fully performed, so that the earnings of said gasoline company will be sufficient to liquidate said outstanding gold notes above

mentioned. In other words, Second Party agrees to operate said gasoline plant in a good-faith effort to liquidate said indebtedness, making such repairs and improvements only as the earnings of said gasoline company justify, having in mind at all times due regard to the liquidation of the gold notes hereinabove mentioned."

The Petroleum Company went immediately into possession. About July 1, 1930, a written contract appears to have been entered into for a substantial reduction in the price of gas under the "dry gas" contract of December 12, 1928. A controversy arose between the vendor and purchaser of the assets and stock of the Gasoline Company. During the negotiations growing out of this controversy, the president of Huber Petroleum Company wrote to one of the adversary parties the following, in part:

"J. M. Huber Petroleum Company has at all times and is now ready, willing and able to deliver the 20,000 shares of stock as contemplated in its contract with the Nevada corporation dated the 17th day of May, 1930. It now tenders this 20,000 shares of stock. However, upon the delivery of this stock it must require the performance of the obligations assumed by the Nevada corporation in their contract, which, among others, are as follows:

"After we acquired the property we discovered that the financial statement dated April 30, 1930, attached to the contract, was not true and correct.

"That it had hidden liabilities not listed as follows:

Fischer & Fischer, attorneys fees.. $3,000.00
Bell Oil & Gas Co. Outages, Diversions and Freight............... 5,375.00
Federal Income Tax............... 2,712.04
B. F. Masten, Retained for expenses freight equalization was deducted 1,672.56

"That in addition thereto it is obligated to deliver to us stock in the Western Gasoline Company in the amount of $3,000.00.

"Total liabilities not set up as of April 30, 1930, $16,260.34.

"We, of course, respectfully request that the above items be delivered, and the hidden liabilities be discharged by paying us the sums above mentioned.

"We will be glad to deposit this 20,000 shares of stock in any of the banks in Amarillo, Texas, to be delivered to the Nevada corporation upon performance by it of the terms of the contract."

With this as the status of affairs, the vendor and purchaser in the May 17, 1930, contract, together with a group of the gold note holders (none of the appellees were included), met on November 7, 1931, at Phœnix, Ariz., to settle their difference. A compromise agreement was then and there executed to rescind in toto the contract of May 17, 1930, and to substitute in lieu thereof a new purchase agreement. Under it the participating gold note holders were to receive 10,000 shares of the stock of the Huber Petroleum Company instead of the original 20,000 to all the gold note holders, and the further sum of $177,000. This was a 25 per cent. reduction on the face value of the notes held by such parties. Of this $3,000 was paid in cash and $174,000 secured by a trust deed on all the property of the Pacific American Gasoline Company of Texas. The said settlement notes were further secured by an assignment of all amounts due under the "dry gas" contract. This was accepted by the Carbon Company. The appellees herein were entirely ignored. No provision whatever was made for their payment.

We call attention to the stipulation on the face of each gold note, inserted as security, which is copied above. Its effect is to provide against preference payment, to insure the operation of the Gasoline Company by its then efficient management by prohibiting a sale of its entire assets, and to provide against the creation of a funded indebtedness without the consent of 80 per cent. of all note holders until all such notes were paid. Each of these provisions was breached by the Phœnix contract of November 7, 1931. A preference was attempted in the payment of approximately $200,000 of these as against the holders of the other $150,000. The entire assets were sold without the consent of stockholders owning almost one-half the entire note issue, and an indebtedness was created ahead of appellees' secured as aforesaid.

■ The effect of the agreement between the stockholders cast into the preorganization contract first quoted and the quoted provisions of the original gold note issue is that the purpose and intent was to dedicate the profits from the operation of the Gasoline Company to the payment of the gold note issue. If not express, the implication is a compellable one from the provisions of the said contract and note.

If we understand appellees' theory, it is that such covenant was in substance carried forward and embraced in the contract of purchase of May 17, 1930, and that they are entitled to have same performed by the Petrole-

um Company. The particular character of the judgment hereafter discussed indicates that the trial court had in mind the above in entering judgment. It is well to note here that appellants apparently do not seriously controvert the liability of the Gasoline Company and the right of appellees to a personal judgment against the Gasoline Company alone, but vigorously controvert the right of appellees to enforce the provisions of the May 17, 1930, contract as against the Petroleum Company. The position of the Petroleum Company is, if we comprehend it: (1) That the May 17th contract was not made for the benefit of the gold note holders; and (2) if for their benefit and being third parties, such contract does not become a binding tripartite agreement until accepted or acted upon by the gold note holders, and the same was rescinded by the Phœnix contract above mentioned before either is shown to have occurred, and such rescission is therefore binding upon the gold note holders, leaving them only the remedy of a personal judgment against the Gasoline Company.

We disagree with the first of these, but agree to the correctness of the second as a legal proposition. It is, we think, too plain for discussion that the May 17th contract contained provisions intended for the benefit of the gold note holders. They were not, however, compelled to accept its provisions. They were not signatories thereof. Unless bound for another reason, which we shall presently discuss, the Petroleum Company, vendee under the May 17th contract, never had any contract with the appellees here until acceptance thereof by appellees is properly shown, and, since we are dealing here with a peremptory instruction, such proof of acceptance must be so conclusively established as not to leave a jury question as to its existence.

The law is, we think, settled in Texas that, "after a contract for the benefit of a third person has been accepted or acted on by him, it cannot be rescinded by the parties without his assent." 13 C. J. 602; Waggoner v. Herring-Showers Lumber Co., 120 Tex. 605, 40 S.W.(2d) 1, and authorities there cited. We assume that it will not be denied that any such rescission, to be valid, must be a bona fide one, and not made for the purpose of defrauding such third person. Berkshire Life Ins. Co. v. Hutchings et al., 100 Ind. 496. We pass this last point with the comment that the evidence seems sufficient to justify the inference that it was made with intent to defraud the note holders not participating, which included all the appellees. Returning to the question of acceptance of the contract of May 17, 1930, we think the evidence directly and conclusively shows such acceptance by appellee Horace G. Miller and the Southwestern Engineering Company shortly after the contract was made. The rights of the Engineering Company passed to appellees' Citizens' National Trust & Savings Bank of Los Angeles, the Ducommum Corporation, and the Great Western Finance Corporation. These last three, with Miller, either own or possess as pledges gold notes in controversy in the aggregate sum of $138,700. As to appellees Ard, Anderson, Murphy, Gibbs, and Riffenberick, the evidence only inferentially shows such acceptance. However, since we have concluded that the other appellees are entitled to all relief obtained, and since the last-named appellees must each prosecute his claim through the receivership allowed to the others in order to prevent a preference, no useful purpose could be served by a reversal as to these, even if we hold the evidence shows the presence of a fact issue for the jury. This will more fully appear herein.

We are impressed with the view that the quoted stipulation of the gold note intended as security therefor, in lieu of a trust deed, was a personal covenant enforceable by the note holder against any purchaser of the Gasoline Company with notice of its existence. We quote from the case of Empire Natural Gas Co. v. Southwest Pipe Line Co. (D. C.) 25 F.(2d) 742, 744: "In the case of Whitney v. Union Railway, 11 Gray (Mass.) 359, 364, 71 Am. Dec. 715, the court said: 'The precise form or nature of the covenant or agreement is quite immaterial. It is not essential that it should run with the land. A personal covenant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding on him merely because he stands as an assignee of the party who made the agreement, but because he has taken the estate with notice of a valid agreement concerning it, which he cannot equitably refuse to perform.' See Pomeroy, § 689; Bald Eagle Co. v. Nittany Val. R. Co., 171 Pa. 284, 33 A. 239, 29 L. R. A. 423, 50 Am. St. Rep. 807; People's Natural Gas Co. v. American Natural Gas Co., 233 Pa. 569, 82 A. 935."

This particular question is not briefed. The statement of facts is more than 1,500 pages in length, filled, page after page, with bickerings of counsel. In its condition we do not care to commit the court definitely to the proposition that the record here brings the present case within the above rule, though we are strongly inclined to so hold.

■ Because the May contract had become binding on the appellees named, we hold the purported rescission contract of November 7, 1931, did not affect their prior rights.

■ As somewhat related to questions just discussed, it is apparently contended that an issue existed as to fraud and deceit in the sale of the Gasoline Company to the Petroleum Company. The appellees were not alleged or shown to be parties to this. It may be true that a rescission suit could have been originally maintained against the Gasoline Company, based upon a common-law action for fraud and deceit, and that a judgment for appellant Petroleum Company therein would have bound appellees, even though they had accepted under the May 17th contract, but such are not the facts of the case. Appellants elected to retain the property and all benefits accruing under said contract. We know of no relief they could now get against the note holders. 10 Tex. Jur. 392; Huffman v. Mulkey, 78 Tex. 556, 14 S. W. 1029, 22 Am. St. Rep. 71; 21 C. J. 208, 209. Especially is this true where, as here, the aggrieved party has pursued the wrongdoer and obtained a full settlement from such party for his damages. There could not be two of such based on the same cause of action. 20 C. J. 5; McLendon Bros. v. Finch, 2 Ga. App. 421, 58 S. E. 690.

■ Appellants filed what they denominate a plea of non est factum. We confess our inability to understand clearly their exact point with reference to this matter. We copy from their brief: "The coupons in evidence, upon which the trial court rendered its money judgment, do not purport to bear even an engraving of the signature of Masten or Ansted. They purport to bear an engraving of the signature of one Whitley C. Collins, and he purports to act as treasurer. It was not shown that Collins actually executed the coupons."

The principal obligation is copied above. By its terms interest is due "at the rate of seven per cent per annum, payable quarterly * * * on the first day of January * * April, * * * July, * * * and October of each year * * * in accordance with and on presentation and surrender of the interest coupons hereto attached." It is not and could not be denied that the interest recovered herein was unpaid. The principal obligation, conclusively shown in our opinion to have been properly issued and executed, provides for such interest. What difference, therefore, could it make whether Collins' name is or is not engraved on the written interest coupons introduced in evidence or whether anybody signed them? The obligation to pay interest springs from the principal obligation. It was breached. No interest was ever paid after July 1, 1930.

We have assumed that appellants' pleadings properly raised said issue. This is doubtful, but is not decided. We overrule this assignment.

■■ Appellants properly raised in the trial court the questions (1) of misjoinder of parties and causes of action, and (2) of nonjoinder as plaintiffs of necessary parties.

It is argued here that the plaintiffs have separate and distinct claims, against which there exist separate and distinct defenses, and that there were other gold note holders not before the court as parties plaintiff, whose rights appellees sought to have adjudicated and which were, in fact, settled by the judgment entered herein.

The plaintiffs whose names appear as such are shown above. They allege: "These plaintiffs further show that there are holders of notes or bonds not represented by the parties to said deed of trust issue, who stand in the same attitude as plaintiffs stand, and this suit is brought for their use and benefit; that as between them and these plaintiffs there are no antagonistic interests; that these plaintiffs substantially represent the class of which said other outstanding note holders are parties; and that this suit is brought for their use and benefit as representatives of said class."

The theory upon which appellees proceeded and the reason actuating the trial court in entering judgment for them may perhaps best be illustrated by reproducing here the material portions of appellees' prayer for relief, practically all of which was granted.

Their prayer is for past-due interest on the gold notes held by them, and:

"That a receiver be appointed to take charge of the affairs of the Pacific American Gasoline Company of Texas, (it appearing that the conduct of the J. M. Huber Petroleum Company and those with whom it is associated, has been fraudulent in the past, and that to leave said Company in its hands will be in effect to permit the continuance of such fraud) and to operate the same in furtherance with the contract of May 17, 1930, or at any rate to operate same to the end that the $350,000.00 note issue may be paid, and with directions to pay the same; or for such further relief in respect to the protection of the rights of these note holders whose notes have not matured (if the court will not enter an order maturing the same) as may be proper or necessary to protect said note holders

against the continued fraudulent and wrongful conduct of the J. M. Huber Petroleum Company and those with whom it is associated.

"(d) And in any event to cancel and hold as fraudulent and void, so far as these plaintiffs are concerned, and so far as the other holders of said $350,000.00 note issue are concerned (other than those who are parties to the note issue secured by the deed of trust in favor of R. C. Ware, trustee, aggregating $174,000.00), the said deed of trust lien and notes issued in furtherance thereof; * * *

"And in any event to enter an order decreeing the validity of the $350,000.00 note issue so far as plaintiffs are concerned, and so far as said other note holders are concerned, save and except those who have acted in fraud of plaintiffs' rights by entering into the scheme to defraud the plaintiffs by the acceptance under said deed of trust; or, in the alternative to declare as valid the whole issue of $350,000.00, and as invalid the indebtedness evidenced by said $174,000.00 note issue and deed of trust.

"(f) For the establishment and fixing of a lien as against the properties of the Pacific American Gasoline Company of Texas, based upon the contract of date May 17, 1930, hereinabove referred to, for the benefit of plaintiffs and said other note holders;

"(g) For the cancellation of the contract between the Pacific American Gasoline Company of Texas and the J. M. Huber Company of Louisiana, Inc., undertaking to abrogate the original dry gas contract between said parties, referred to in said contract of May 17, 1930;

"(h) For a judgment in behalf of the Pacific American Gasoline Company of Texas, as against the J. M. Huber Company of Louisiana, Inc., for the amount due under said original dry gas contract rather than under the contract undertaking to abrogate the same.

"(i) For a full and complete accounting of the affairs of the Pacific American Gasoline Company of Texas, to the end that the Court may be advised in respect to what relief is necessary in behalf of these plaintiffs, to protect them, and the parties for whom they sue."

In approaching a solution of appellants' contentions, these facts must be kept in mind: (1) That the major security behind the $350,-000 gold note issue was originally, and still is, the net revenue accruing from the operation of the Gasoline Company, particularly its large profits from the "dry gas" contract with the Petroleum Company; (2) that this was recognized by all parties, and supposedly sufficient guaranties of its continued operation, so that its profits would be available to pay said note issue, were incorporated in the various written instruments already referred to. Of these, appellants were parties to the last one of May 17, 1930; (3) that, notwithstanding this, appellants met a group of the gold note holders on November 7, 1931, at Phœnix, Ariz., and entered into a contract, the terms of which have already, in part, been stated. Its effect was to prefer a group of note holders as against appellees in such way as to practically destroy all the security held by appellees and all chance to collect their notes.

The major purpose of appellees in filing this suit was to secure the performance of the original contracts intended as security for their notes and to abrogate that which has allegedly been done by appellants in fraud of their rights, and in breach of said contracts. In both these matters they have a community of interest, springing out of contracts intended for their joint benefit. It would have been perhaps an idle procedure, as we shall presently attempt to show, for any one of these to have proceeded singly to take a judgment and secure execution. In addition, such procedure would have had the effect of creating a preference, which is the very thing of which they are complaining as having been wrongfully and illegally done by appellants.

Most, if not all, note holders, were nonresidents of Texas. In the very nature of this transaction, the identity of all of them would be difficult, if not impossible, of ascertainment.

The peculiar facts of this case clearly distinguish it from all the cases cited by appellants.

The general rule with respect to parties has been correctly stated by appellants, but we regard the facts of this case as fixing its status as a "class suit," and as authorizing the procedure followed by appellees. We quote:

"There are exceptions to the rule that all persons having an interest in the subject-matter of an equity suit must be made parties. The most familiar and well-established of these exceptions is that which rests upon the doctrine of virtual representation. This doctrine recognizes the right of one person or a few persons to sue for themselves and others similarly situated—as, for example, when the joining of all would be impracticable, would produce interminable delay, and would probably obstruct the purposes of justice.

" 'Under this doctrine, the persons who are not joined by name as parties are in a sense before the court. They have been called quasi parties, and have even been said to be parties in substance and legal effect. In all cases to which the doctrine of representation applies there must be joined as parties persons who fairly represent the interest or right involved, so that it may be tried fairly and honestly. It is sufficient if the parties before the court enable it fairly and fully to adjudicate the question involved. The parties represented must have a common interest with those before the court, and consequently the parties before the court cannot act as representatives if their interests are antagonistic to those who would be represented.'

"The doctrine of virtual representation is particularly applicable to the so-called 'class suits.' Among these are suits that involve the interests of numerous members of an unincorporated association or of beneficiaries of a trust, stockholders' suits, and suits to enjoin strikes of laborers." 32 Tex. Jur. 27–29, §§ 18, 19, and numerous authorities there cited.

Appellants present by their thirty-second proposition the contention that, since the principal office of the Gasoline Company was in Hutchinson county, the order of the district court of Potter county appointing a receiver to take charge of all property of said corporation was void. This because of the terms of article 2312, R. S. 1925. We overrule this on the authority of Bonner v. Hearne, 75 Tex. 242, 12 S. W. 38.

By numerous assignments the action of the court in appointing a receiver for the Gasoline Company is assailed. Some of the reasons given are: (1) That said company was shown to be solvent, and that either injunction or execution would have afforded appellees an adequate remedy; (2) that the court erred in giving the receiver authority to operate the business of said Gasoline Company, as distinguished from the duty to sell said property for the satisfaction of the claims of creditors.

We are not able to agree with appellants. To appraise this contention properly, it is essential to keep certain facts in mind. The Carbon Company controlled the Petroleum Company. The latter bought all the stock of the Nevada Company, which in turn owned all the stock of the Gasoline Company. The profitable "dry gas" contract was originally between the Carbon Company and the Gasoline Company. Looking through the form to the substance, it appears that in reality the

Carbon Company has since May 17, 1930, been buying "dry gas" from itself. The price of same has been materially reduced in violation of the contract of December 12, 1928, referred to above. The profitable operation of the Gasoline Company depends upon a continuous flow of gas to its plant from the field where it once owned valuable contracts and its ability to comply with its contract to furnish the Carbon Company a minimum requirement of dry gas. Since May, 1930, the Carbon Company has been in possession of the Gasoline Company, and since July, 1930, not a cent has been paid on appellees' indebtedness. It is now past due. The Carbon Company owes a large sum on its "dry gas" contract to its "hand maiden," the Gasoline Company, which in turn is the obligor on the notes in question. Collection of the real amount due on this "dry gas" contract, so that same may be paid on the notes, is necessary, and is one of the prime objects of the receivership. Suppose A, the holder of one of these notes, brings suit alone, as appellants contend should be done, procures judgment and execution, and the property of the Gasoline Company is placed in the hands of the sheriff. Who will keep the contracts for gas from the fields, and the one with the Carbon Company alive, pending all this? And who, except perhaps the Carbon Company, would bid on this property? Its peculiar situation is such that a shutdown and forfeiture of said contracts renders the assets of the Gasoline Company of small value apparently. A sells it. What becomes of the claim of the other note holders? How could a preference be prevented under such circumstances?

As before stated, the intent to dedicate the profits from the continuous operation of the Gasoline Company to the payment of the gold note issue is plain. Whether the facts here create a trust, an equitable lien, or amount to a personal covenant performable by an assignee of the property with notice, we do not need to expressly decide. Surely a court of equity in the presence of these facts may not fold its hands and punily excuse itself on the plea that it is impotent to give the only relief that will make effective the intent of the contracting parties, and prevent the perpetration of fraud. Such a plea makes a contract "more honored in its breach than in its observance." We here set down what we consider some of many appropriate quotations from eminent authorities:

"A simple contract creditor of an individual or a corporation would not be such if he has a lien, claim or other such interest in the

defendant corporation's property. However, such simple contract creditor may have a right to be paid out of a particular fund. If this is so, he can in equity get protection of that fund to prevent it from being dissipated so as to defeat his right. If he has a lien or charge against the fund that would give him a priority as to distribution of the fund, nevertheless when a party has a right to be paid out of a particular fund he may obtain an injunction and if an injunction is not an adequate protection he may obtain a receiver of such fund to prevent it from being misappropriated." Clark on Receivers, § 195.

"An equitable lien is not an estate or property in the thing itself, nor a right to recover the thing—that is, a right which may be the basis of a possessory action; it is neither a jus ad rem nor a jus in re. It is simply a right of a special nature over the thing, which constitutes a charge or encumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action." Pomeroy's Eq. Jur. (4th Ed.) § 1233.

"When equity has jurisdiction to enforce rights and obligations growing out of an executory contract, this equitable theory of remedies cannot be carried out unless the contract creates some right or interest in or over the specific property, which the decree of the court can lay hold of and by means of which the equitable relief can be made efficient. The doctrine of 'equitable liens' supplies this necessary element; and it was introduced for the sole purpose of furnishing a ground for specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law." Id. § 1234.

"Where a grant is made on the faith and because of a promise, a breach of the promise is necessarily a fraud, not to be tolerated in equity although the promise be only verbal. In such cases, where the circumstances are such as to deny the right to a rescission, equity will impose a trust upon the property as a means of defeating a fraudulent and wrongful acquisition of the title. * * * Equity turns the fraudulent procurer of the legal title into a trustee, to get at him." Faville v. Robinson, 111 Tex. 48, 227 S. W. 938.

"To dedicate property to a particular purpose, to provide that a specified creditor, and that creditor alone, shall be authorized to seek payment of his debt from the property or its value, is unmistakably to create an equitable lien." Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 457, 41 L. Ed. 871.

"If one makes an appropriation of a fund which, if permitted to stand, would, by reason of the circumstances attending the transaction, work a wrong to another having an equity therein and give him an unconscientious advantage over the other, the act will be regarded as what is termed a constructive fraud in equity." 26 R. C. L. 1233, § 81.

"That lien arose by implication, as a natural equity creating a constructive trust in the vendee, that he should not keep the estate of another without paying for it." White v. Downs, 40 Tex. 225, 231.

"The more rational conception of a contract, vastly superior as it was to that of the formalistic regime, proved far from sufficient to the needs of a developing civilization. It overlooked first the fact that undertakings should be performed, not broken, and that a system of judicial relief which merely furnished balm for the hurt, and consequently recognized no substantive rights or obligations until the hurt was inflicted, failed to fully discharge the obligation of the judiciary to the citizen. Performance of a contractual undertaking is clearly 'the essential thing intended'. The normal end or termination of every contract is performance, not breach. * * * At the time of entering upon the agreement each expects to receive and render performance according to its terms, and the contract can never be fully satisfied unless its execution is of that character.' 'Lightly to permit a contracting party to disregard his obligation, and to compel the obligee to accept not the thing contracted for, but money damages, is to place a premium on contractual insincerity.' 'The policy of the law is that business men should keep their contracts, and not turn the contractee over to the uncertain remedy of an action at law for damages for non-performance.' 'Fruition of the thing, the subject-matter of the agreement, is the object, the failure of which would be but illy supplied by an award of damages.' 'Contracts ought to be performed. To break them and to propose compensation for the breach by damages is not complete justice.' Equity courts, therefore, seek to prevent 'the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach', or 'the infliction of irreparable injury by a causeless breach.' They are not 'astute to find some way in which breaches of contract may be excused. A court of equity manifests its value in the administration of justice in no more effective way than in constantly making it clear that it will not

850

tolerate deliberate and unconscionable breaches of contract.' Equitable remedies are therefore predicated on the contract, where the common-law action arises from the breach.

"These varied and emphatic declarations of the theme in point are quoted to bring into clear relief a principle lying at the very heart of the distinction between the equitable and the legal conception of remedies growing out of the contractual relation. Unfortunately courts have not elaborated with equal explicitness the equally vital distinction between the legal and equitable idea of the contract itself, a distinction fully as marked and perhaps of even greater importance." Lawrence on Equity, § 96.

See, also, quotation from the case of Whitney v. Union Ry. Co., 11 Gray (Mass.) 359, 71 Am. Dec. 715, supra.

The effect of the judgment in this case was to require a substantial performance of appellants' contract. No adequate remedy existed in law that would fully protect appellees in our opinion. We overrule these assignments.

■■ Evan O. Thomas Company, holder of settlement notes under the Phœnix contract of November 7, 1931, intervened and asked for and obtained judgment against the Pacific American Gasoline Company and J. M. Huber Petroleum Company jointly and severally, the sum of $3,980.26.

Appellants timely objected to their presence in the suit. This party was a necessary one, since it had a direct interest in the subject-matter of the suit. Appellees were attempting to set aside its trust deed and to abrogate what was done at Phœnix in so far as it affected their rights under previous contracts. Appellees rightly made all the settlement note holders under the Phœnix contract parties defendant. There was no misjoinder of parties, but in our opinion the appellants correctly contend that such intervention under the relief sought constituted a misjoinder of causes of action. Intervener's cause of action arose out of an entirely different transaction from that relied on by appellees, and is subject to distinct and separate defenses. It constituted another and different suit. The plea of misjoinder of causes of action is sustained, and judgment here rendered that Evan O. Thomas Company take nothing by its said intervention and suit, without prejudice, however, to its right to present and prosecute its claim in the said receivership proceedings.

■■ As shown by contract of December 12, 1928, mentioned above, a "dry gas" contract was made between the Gasoline Company and the Carbon Company for the sale by the former to the latter of "dry gas" for a price of 1½ cents per thousand to July 1, 1931, 2 cents for the next two years and 1¾ cents thereafter during the life of the contract. After the purchase of the Gasoline Company by the Petroleum Company in May, 1930, the Carbon Company and the Gasoline Company in July, 1930, made a contract reducing the price of gas under the 1928 contract by about one-third.

This last contract was annulled by the decree entered herein, and error was properly assigned thereto by appellants, and such action is here vigorously urged by them as error for reasons appearing in the discussion of this assignment.

We again call attention to one of the stipulations of the contract of purchase dated May 17, 1930: "It is further mutually agreed that second party will operate the business of the Pacific-American Gasoline Company of Texas along the same general lines that it is now operated to the end that its contract with J. M. Huber Company of Louisiana, Incorporated, will be fully performed, so that the earnings of said Gasoline Company will be sufficient to liquidate said outstanding gold notes above mentioned."

It is argued by appellants that the modification contract of July 1, 1930, considered as a whole, benefited the Gasoline Company. We copy a further contention from their brief: "It should be remembered, however, that the contract of May 17, 1930, was between the Nevada Company and the Petroleum Company, whereas the modification contract, which is cancelled, was between the Gasoline Company and the Louisiana Company, the same identical corporations which executed the modification contract. Further there is nothing in the contract of May 17, 1930, which inhibits such modification as was made." The above two constitute the major reasons relied on for reversal of the court's action in cancelling the July, 1930, contract.

It has already been pointed out that all corporations involved herein in a sense were one and the same after May 17, 1930, or rather that all others were but the shadows of the Carbon Company. The July, 1930, contract provides that the Carbon Company through its subsidiary, the Petroleum Company, contracts to do or have done certain things. The modification of the 1928 contract was justified by the executive head of the Carbon Company

on the ground that it was "all in the family." The conduit (Petroleum Company) through which the Carbon Company did certain business in Texas signed the May 17th contract stipulating in effect to faithfully perform the November, 1928, "dry gas" contract. Now it contends in effect that it had the right to modify this last contract because not a party to it, and nothing appears in the contract to prevent it.

We quote:

"The legal fiction of the separate entities of two corporations, the stock of which is owned by the same parties, should be disregarded when necessary for the prevention of fraud or to protect the legal rights of third parties. Upon ascertainment of all the facts, it is the prerogative of the court and not the jury to look through the forms to the substance of the relations existing between the corporati' .s. Williams v. Freeport Sulphur Company (Tex. Civ. App.) 40 S.W.(2d) 817; Oriental Investment Co. v. Barclay, 25 Tex. Civ. App. 543, 64 S. W. 80; Buie v. Chicago, etc., Ry., 95 Tex. 51, 65 S. W. 27, 55 L. R. A. 861; Fowler v. Small (Tex. Civ. App.) 244 S. W. 1096, 1097; O'Neal v. Jones (Tex. Civ. App.) 34 S.W.(2d) 689; 14 C. J. 61, § 22; Id. 62, § 25; 10 Tex. Jur. 648, § 49.

"Upon ascertainment of the facts, the courts will disregard the fiction of corporate entity where the fiction (1) is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong." Continental Supply Co. v. Forrest E. Gilmore Co. (Tex. Civ. App.) 55 S.W.(2d) 622, 628.

As shown above, the Carbon Company was a party to the May contract through its creature, the Petroleum Company, and at any rate as a third party it must respect it under the facts of this case. Raymond v. Yarrington et al., 96 Tex. 443, 72 S. W. 580, 73 S. W. 800, 62 L. R. A. 962, 97 Am. St. Rep. 914.

We will not lengthen this opinion to detail any evidence pro or con as to the benefits to the Gasoline Company of the July contract. Certain it is that the Carbon Company benefited 100 per cent.

The appellees' case, in so far as it relates to the May 17th contract, was in the nature of a specific performance suit. We know of no authority that gives the court the right in such a suit to substitute for the parties and against the consent of one of them another and different contract upon the ground that such substituted contract is beneficial to the nonconsenting party.

The Petroleum Company was but the hand of the Carbon Company. If the hand offend, will the living spirit behind its movements be permitted to escape upon the empty ground that such act was not its own? With the wisdom of a legislative enactment which permits a foreign corporation to own the stock of a domestic one, the judicial department of the government is not concerned, but a court of equity leaves itself open to the charge of downright gullibility if it closes its eyes and refuses to look through the shadow of a fictional corporate existence to see and ascertain its real ownership, to prevent fraud and protect legal rights. The Carbon Company in reality had a meeting with its alter ego, and determined that the contract price of gas, existing as one of the major securities behind the note issue in question, was too high, and reduced it. The trial court correctly canceled its action.

We have patiently examined many assignments of error relating to the admission of evidence. In our opinion, the action of the trial court with respect to these was either correct or harmless, since none of this evidence could have affected the result, if admitted. All are overruled.

The record in this case is one of the largest ever reaching this court. In order to hold this opinion within a reasonable length, we have omitted detailing any except controlling facts, and these have in many instances been abbreviated to no more than mere conclusions.

It is the judgment and decree of this court that the properties and affairs of the Pacific American Gasoline Company of Texas be administered under the trial court's judgment of receivership until the further orders of said trial court, to the end that no unlawful preference may be allowed to any creditor of same, and to insure the orderly conduct of its affairs in accordance with its contracts and agreements herein set out, and any portion of said judgment which is or may seem to be contrary to this decree is hereby reformed to conform to its general purpose and intent.

The judgment as to all appellees except Evan O. Thomas Company is affirmed. As t(

the latter, the judgment is reversed and rendered without prejudice, and all appellees to be subject to and governed by the decree of this court immediately above set out.