### WOODSON et al. v. McALLISTER et al.
### No. 9813.

Circuit Court of Appeals, Fifth Circuit.
June 30, 1941.

For prior opinion, see 119 F.2d 924.

H. Grady Chandler, of Austin, Tex., Chandler Lloyd and Dallas C. Biggers, both of Dallas, Tex., and C. W. Trueheart, of San Antonio, Tex., for appellants.

W. L. Matthews and J. D. Wheeler, both of San Antonio, Tex., for appellees.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

We gave this case full and painstaking consideration originally, and can say nothing new in response to the petition for a rehearing. We should not write anything except for the positive and repeated assertions therein that this or that statement of the court is not supported by the record.

On page 125 of the record McAllister was asked when the operating contract ceased to receive membership fees, and he answered January 1, 1938. This was referred to by the court to illustrate that the record does not show when, if at all, the operating contract was entirely surrendered; but nevertheless our opinion proceeded upon the theory that it was actually surrendered in toto in September, 1931. The important thing is that prior to that time the depression had set in for the San Antonio Building & Loan Association, and that McAllister was willing to surrender his contract, with its vanishing excess profits, for a fixed salary of $25,000 a year, a sale of the furniture, fixtures, and equipment, and $50,000 in cash out of the special reserve fund which otherwise he was not entitled to withdraw until after the payment of every loan made during the existence of the manager's contract.

It is contended in the petition for a rehearing that the only issue in this case is whether or not the permanent stock was worth more than $300,000. Counsel say: "If it was worth substantially more, the stock issued to him was not a 'fictitious issue' and could not be cancelled in this suit. That is, if the Court finds that the stock was worth even as much as $50,000 more than the $300,000, then this case falls squarely within this Court's decision in Park vs. Compton, 55 F.2d 80, and within the holding of the Texas court in Pacific American Gasoline Co. vs. Miller, 76 S.W. 2d 833, and the decision of the Supreme Court of the United States in Memphis & Little Rock R. Co. vs. Dow, 120 U.S. 287."

We decided this issue in our original opinion when we stated that Southern Associated paid in cash full value for the 3,000 shares of permanent stock it received from San Antonio Building & Loan Association. The accuracy of this statement is practically admitted in the testimony given by McAllister himself, on pages 86 and 87 of the record, where it appears that the issuance of $400,000 of good-will stock to him within a period of two days practically cut in half the investment of shareholders who had paid cash. We quote from page 87 as follows:

"Q. Now, we have, as already shown this morning, people, Mrs. Woodson and others, who had put in $375,000.00, and you have in your possession at this time $400,-000.00 worth of stock in Southern Associated Companies as of then, and you would of course have shared in the liquidation of Southern Associated Companies? A. Yes.

"Q. Now, that being true, assuming that those facts had taken place within a period of two days, these other shareholders in Southern Associated Companies would not have received back the actual cash or its equivalent that they had only four days before put into Southern Associated Companies? A. That is right.

"Q. Would you have gotten a part of their money? A. That is right.

"Q. They would have gotten less than fifty cents on the dollar, or approximately

fifty cents on the dollar? A. Yes, approximately.

"Q. Because you had approximately four-ninths of the stock? A. Yes."

■ Counsel say that, if Southern Associated did not acquire the 3,000 shares of permanent stock from McAllister, the stock was acquired in violation of McAllister's option. McAllister is estopped to make this claim because, according to his own testimony, he was acting as president of San Antonio Building & Loan Association in selling the permanent stock to Southern Associated, and as president of the latter in buying the stock. He failed to exercise the option for himself, and exercised it for and in the name of Southern Associated, without making any formal transfer of his option so far as the record shows. Having bought the stock for Southern Associated with the money and in the name of Southern Associated, he cannot now be heard to say that there was any violation of his option in this transaction.

The following appears in the brief of appellees in support of their petition for a rehearing:

"The majority opinion of this Court states that 'months before the transaction in question the Building & Loan Association had begun to reduce its dividends' and that 'early in 1931 the rate was reduced from ten to eight per cent.' This statement is not supported by the record. The record merely shows that McAllister testified, 'When we started out in 1921 we paid 10%.' There is no evidence in the record as to when this was reduced to 8%."

The following is what was said in our opinion: "Months before this transaction, the association had begun to reduce its dividends to shareholders. Early in 1931, the rate was reduced from ten to eight per cent; later, from eight to seven per cent; and then, on December 31, 1931, it was reduced from seven to three per cent. There was a definite decline in business conditions beginning in July, 1931, so McAllister testified."

Our authority for this statement was the following (R. p. 113):

"Q. Mr. McAllister, in the year 1931 the San Antonio Building & Loan Association reduced its dividend rate on its then classes of shares? A. Yes.

"Q. At what time did another reduction in the dividend rate take place? A. When we started out in 1921 we paid ten per cent.

"Q. After the reduction made in the early part of 1931, from eight per cent to seven per cent, when did the next reduction in dividend rate take place? A. December 31, 1931.

"Q. To what was that reduction? A. From seven to three per cent at that time."

Attorneys for appellees go out of the record to say that, as a matter of fact, the dividend rate was reduced from ten to eight per cent prior to 1926. This may be true, but, from the above evidence of McAllister himself, the fact that impressed the court was that early in 1931 the dividend rate was reduced, and, by July, 1931, the association was beginning to feel the full effects of the depression, which was about two months before the permanent stock was issued in September, 1931. In August, 1931, a ban on withdrawals was discussed, and the following month the withdrawal of their funds by stockholders was actually limited to fifty per cent of the receipts of the association. At page 122 of the record Mr. McAllister testifies that, in the middle of the year (1931), "things started to going down."

All of this clearly shows, in our opinion, that the option to buy the permanent stock at par was worth absolutely nothing in September, 1931; that the permanent stock probably could not have been sold at all on the open market, or in any way except to a holding company with an interlocking directorate; and that it was not to the interest of the association to release the special reserve by paying out fifty thousand dollars which had been built up to meet such an emergency as the association was confronted with on and after July, 1931.

No prudent investor would have bought any of this permanent stock at par in September, 1931, if he had known or been told the following undisputed facts which McAllister undoubtedly knew, and the directors knew or should have known:

When the association started out in 1921 it paid a ten per cent dividend; later, at a date not shown in the record, the rate was reduced to eight per cent. Early in 1931 the dividend rate was further reduced from eight to seven per cent. In July, 1931, the association was feeling the effects of the depression; its delinquent loans were unusually large; its receipts were falling off; it owed large and increasing sums to local banks. In August, 1931, it discussed the ban upon withdrawals by stockholders which was put into effect the following month.

Now, let this prudent investor be further advised that, in order to issue this stock at all, the association must obligate itself to pay a fixed salary of $25,000 per year, incur other out-of-pocket expenses, and entirely wipe out its special reserve amounting to over fifty thousand dollars. If he still wanted to invest in September, 1931, good faith required him to be further informed that, for the option to buy, a four-ninths interest in every share of permanent stock he bought at $100 per share would be given to McAllister, so that, practically as soon as he made the investment, the book value thereof would be approximately fifty cents on the dollar (R. 86, 87).

■ It is argued that the special reserve was distinct from the legal reserve, and that no law was violated in doing away with it. This is true in one sense. The special reserve was a contractual and not a statutory security for the protection of the association's stockholders. It was not required by statute, but it was provided for in the managers' contract "as a further guarantee that the association may experience no losses on loans made by said managers, and as an evidence of good faith."

The managers agreed to set aside, out of their share of the association's net earnings, certain specified percentages of the total dividends paid or credited during the year which was to constitute a contingent reserve. It was further required that this reserve "be invested in the association's stock and held in trust" so long as the contract should remain in force, and so long as any loans made by the association while the contract was in force were on the books. This trust was not to be terminated even upon the cancellation of the managers' contract. It would have been a serious thing for the president and directors to release this trust fund in September, 1931, under the financial conditions existing at that time, even if they had been dealing with a stranger to the association, but to release it to the president himself in a transaction in which he and a majority of the directors were to receive some of the stock of the corporation purchasing the permanent stock of the association presents a complicated series of facts and circumstances requiring the most careful scrutiny of a court of equity.

■ An important fact present in this case, which should never be overlooked, is that corporate officers and directors occupy positions of trust and confidence with respect to corporate stockholders. When they bargain for themselves with themselves for corporate stock or property, they are not at liberty to deal as if the transaction were between strangers. We shall not belabor the point, because it will suffice to say that the permanent stock was not worth more than $300,000, which amount was fully paid in cash, and that the stock given to McAllister was a wholly fictitious issue which should be cancelled.

The petition for rehearing is denied.

HUTCHESON, Circuit Judge (dissenting).

Having once dissented from the opinion that the McAllister stock was fictitious, I dissent again.