**SAN PEDRO STATE BANK, Appellant,**

v.

**Robert L. ENGLE and Lawrence Garrison, Appellees.**

**No. 16705.**

Court of Appeals of Texas, San Antonio.

Sept. 1, 1982.

Rehearing Dismissed as Moot Oct. 4, 1982.

Carl Robin Teague, Oppenheimer, Rosenberg, Kelleher & Wheatley, Inc., San Antonio, for appellant.

Alan L. Schoolcraft, Sisk, Van Voorhis & Schoolcraft, Universal City, for appellees.

Before ESQUIVEL, CANTU and BASKIN, JJ.

## OPINION

ESQUIVEL, Justice.

This is a suit for breach of contract. Appellees Robert L. Engle and Lawrence D. Garrison brought suit as third party beneficiaries against San Pedro State Bank alleging that the Bank breached an "escrow agreement" by disbursing funds deposited in an "escrow account" to persons other than the appellees. The appellant Bank filed a cross-action against Grissom Apartments, Ltd. and Richard E. Snell which was severed from the present case.

The material facts are not in dispute.

In a bench trial, the lower court found and the testimony reflected that the Bank and Grissom Apartments, Ltd. (hereafter partnership) executed an "escrow agreement," Defendant's Exhibit 2, on December 13, 1977. Pursuant to the "escrow agreement," the partnership created a designated checking account which would receive deposits from persons such as the plaintiffs who, as limited partners, would authorize the partnership to deposit their capital contributions into the "escrow account."

According to the original terms of the "escrow agreement," the Bank was obligated to pay the money on deposit according to the partnership's instructions if (1) the partnership had deposited at least $200,000.00 into the account on or before midnight March 8, 1978, *and* (2) the partnership delivered an "irrevocable commitment" to the

Bank. Additionally, the "escrow agreement" required the Bank to return all monies which the partnership had deposited on behalf of the limited partners to each depositor if the partnership failed to deposit at least $200,000.00 on or before midnight March 8, 1978. The agreement further provided that it could not be altered, modified or amended by the respective parties.

Subsequently, on or about February 20, 1978, the Bank and the partnership agreed to change or modify[1] the "escrow agreement" by extending the termination date from March 8 to April 15, 1978. The partnership agreed to reprint the second and fourth pages of the "escrow agreement," the page which included the termination date of the agreement, and insert the changed agreement in the prospectus which the partnership would give to proposed limited partners. The evidence showed that this was not done as of February 28, 1978.

The trial court also found that, on or about February 27, 1978, appellees Engle and Garrison became limited partners in the partnership when each appellee deposited $13,500.00 into the "escrow account." Moreover, the trial court found that the appellees became third party beneficiaries when their capital contribution to the partnership was deposited in the "escrow account." The trial court noted in the findings of fact that the appellees deposited their money in reliance upon the representation by the partnership that the termination date of the "escrow agreement" was March 8, 1978. It is undisputed that on or before March 8, 1978, the total amount of funds on deposit in the "escrow account" was less than $200,000.00.

The evidence showed that the "escrow account" exceeded $200,000.00 on April 14, 1978. On that same date, a letter, signed by the president and managing partner of the partnership and addressed to the president of the Bank, was received by the Bank. The letter noted, in pertinent part:

This letter is confirmation for the authorization of disbursements from the Grissom Apartments, Ltd., Escrow Account.

---

1. The modification was effected by interlineation.

As per this date, we have met the requirements of our escrow agreement and the following are instructions for your bank to disburse funds to the following individuals:

> A cashier's check in the amount of $40,-000 to Stewart Title Company from Grissom Apartments, Ltd., Escrow Account, and a $25,000 bank-to-bank wire to the Imperial Bank of Los Angeles, California, to the account of Escrow Management Company from Grissom Apartments, Ltd.

The Bank accepted this letter as the "irrevocable commitment" pursuant to its understanding of the "escrow agreement."

In points nine, ten and twelve of the findings of fact, the trial court specifically found that:

9. San Pedro State Bank knew or should have known that, before making their deposits, the plaintiffs had received copies of the writing titled "Escrow Agreement" which showed that the expiration date was March 8, 1978.

10. San Pedro State Bank knew or should have known that, in depositing the $13,500.00, the plaintiffs were relying upon the representation by Grissom Apartments, Ltd., that the termination date of the agreement (called "Escrow Agreement") between San Pedro State Bank and Grissom Apartments, Ltd., was March 8, 1978.

12. San Pedro State Bank did not receive the "irrevocable commitment" before disbursing the funds from [the designated "escrow account."]

The trial court in its conclusions of law noted:

1. The change by San Pedro State Bank and Grissom Apartments, Ltd., of the termination date of the agreement (called "Escrow Agreement") from March 8, 1978, to April 15, 1978, was not binding on the Plaintiffs under the facts of this case.

2. San Pedro State Bank improperly disbursed funds from [the account] to persons other than Plaintiffs because the agreement (called "Escrow Agreement") between San Pedro State Bank and Grissom Apartments, Ltd., terminated on March 8, 1978, which date was before the Bank made the disbursements.

3. San Pedro State Bank improperly disbursed funds from [the account] to persons other than Plaintiffs because the Bank did not receive the "irrevocable commitment" before it disbursed the funds.

4. Either the conclusion numbered 2 or 3 will support a judgment for the Plaintiffs against San Pedro State Bank.

The appellant's first eight points of error raise two issues: (1) whether the original parties to a third-party beneficiary contract have the power to modify an agreement prior to the third-party beneficiary's acceptance of the contract, and (2) whether the record supports the findings of fact and conclusions of law in view of the well-settled rule of modifications to third-party beneficiary contracts. We hold that the original parties to a third-party beneficiary contract hold the power to modify but, under the facts of this case, the modification was not binding on the appellees.

It is undisputed that the Bank did not agree to the modification until the Bank (1) determined that no money had been deposited in the "escrow account," and (2) the Bank obtained a verbal assurance from the partnership that no money was left with the partnership (by a limited partner) to be deposited in the Bank. The evidence reflected that no money was left with the partnership at the time the modification occurred. It is clear that the appellees Engle and Garrison deposited their monies subsequent to the modification.

 The rule is well-settled that a third-party beneficiary contract may be rescinded or modified by the original parties prior to acceptance by the third party. *Firestone Tire and Rubber Co. v. Fisk Tire Co., Inc.*, 131 Tex. 158, 113 S.W.2d 175 (1938); 14

Tex.Jur.3d *Contracts* § 240 (1981). At first glance, there appears to be no basis upon which the trial court's conclusions of law number one and two can stand.

However, there is sufficient evidence to support the trial court's findings of fact numbers nine and ten. The appellees place much emphasis upon the prospectus, a copy of which was introduced in part as Plaintiff's Exhibit 3, which was in the possession of the Bank. On page 99 of the prospectus, a copy of the limited partner's representation letter, the terms of which were never modified, was included which contained the following language:

> It is my understanding that all of my funds are being escrowed, until an irrevocable commitment is issued and received by the escrow agent and in the event that said irrevocable commitment is not issued and received in ONE HUNDRED TWENTY (120) days from the date of the Escrow Agreement, all my funds will be promptly returned to me by the escrow agent. (See Escrow Agreement)

Although this representation letter was not one of the four pages of the "escrow agreement" actually signed by the Bank, the "escrow agreement" signed by the Bank was on pages 92 through 95 of the prospectus. The "escrow agreement" was not wholly separate from the prospectus. In fact, the "escrow agreement" was an integral part of the prospectus.

The Bank argues that it would be manifestly unfair to charge the Bank with a duty the Bank did not accept by contract: namely, the duty of policing "secondary" agreements between depositors. The Bank stresses that this duty was not contemplated by the Bank. It would be manifestly unfair *not* to charge the Bank with the actual knowledge it had or knowledge it should have had, as found by the trial court in its findings of fact numbers nine and ten, merely because the Bank only signed a few pages of the prospectus.

As the record reflects, the "escrow agreement" was included in the prospectus; the duties and obligations of all parties were delineated in the prospectus; and the Bank had a copy of the prospectus. In fact, John Massie, Jr., the individual charged with "running the Bank," admitted that he "probably scanned over" the representation letter. Thus, the Bank accepted its status as a fiduciary of all the parties when it originally signed the "escrow agreement" through its agent Lindsay Graham, a bank lending officer, and when it modified the "escrow agreement" through its agent Massie.[2] Even though the Bank had knowledge of the modification and even though the Bank had ample opportunity to notify the appellees of the modification, the Bank remained silent when the appellees deposited their money. Without a doubt, the Bank did not act with the confidence and trust required as fiduciary of the appellees. Clearly, the trial court properly held that the modification of the "escrow agreement" was not binding upon appellees Engle and Garrison.

Furthermore, in finding of fact twelve, the trial court specifically found that the Bank did not receive the "irrevocable commitment" prior to disbursing the funds from the "escrow account." Thus it can be assumed that the trial court impliedly found (1) the letter from the partnership to the Bank dated April 14, 1978, was not received before the expiration of 120 days, which was April 11, 1978, pursuant to the representation letter, or (2) the letter from the partnership to the Bank, dated April 14, 1978, insufficiently satisfied the requirements of an "irrevocable commitment," or (3) the letter, as a matter of law, did not constitute an "irrevocable commitment."

Assuming *arguendo* that the letter did constitute an "irrevocable commitment,"

**2.** It is absurd to believe that the Bank can hide behind the law of modifications of third-party beneficiary contracts and permit the representation that the "escrow agreement" cannot be "altered, modified or amended" to be given with nary a word uttered from the Bank. Under the facts of this case, the Bank certainly had a duty to have deleted the provision prohibiting alteration or modification from the "escrow agreement" when the agreement was modified and at *least* to have notified the appellees that the modification occurred.

the letter was not received until 3 days following the termination of the 120 day period which commenced on December 13, 1977. Thus the Bank's actual or implied knowledge of the respective duties of the parties as stated in the prospectus and, in particular, the representation letter, as shown by the testimony of Massie, supports the findings of fact and conclusions of law by the trial court. Viewing the entire record, it is evident that sufficient evidence supports the trial court's findings of fact nine, ten, and twelve and the trial court properly arrived at the conclusions of law one and two. Therefore, we overrule the Bank's points of error regarding this issue.

We do not reach nor do we suggest an opinion with regard to the compelling question of whether the letter dated April 14, 1978, constituted an "irrevocable commitment."

Therefore, the judgment of the trial court is affirmed with costs assessed against appellant Bank.

BASKIN, Justice, concurring.

I concur.

This is a suit for breach of contract brought by two third party beneficiaries, hereinafter called plaintiffs, against San Pedro State Bank (Bank) to recover funds allegedly wrongfully disbursed by Bank from "an escrow account" which funds, they claim, should have been paid over to plaintiffs.

Grissom Apartments, Inc., proposed to build a large, multimillion dollar apartment complex in San Antonio. The financing would be partially by purchase of limited partnership shares in increments of $13,500.00. The partnership would receive a percentage of ownership of the project, and, in consideration therefor, would contract for and supervise the design, construction and ultimate operation of the apartment complex.

On December 13, 1977, the Bank and Grissom Apartments, Ltd., a limited partnership which would act as a general partner, executed an instrument entitled "Escrow Agreement." The purpose of the "escrow agreement" was to provide an account in the Bank called "escrow account" into which funds invested by prospective limited partners could be deposited until the minimum amount of $200,000.00 had been accumulated. None of the funds so deposited would be released or disbursed except upon the written authorization of Grissom Apartments, Ltd.

As initially executed, the "escrow agreement" provided that the escrow period would terminate at the earlier of the dates when the total amount deposited in the escrow account would be at least $200,000.00 or at midnight March 8, 1978.

Upon termination of the "escrow period," if the funds on deposit equalled $200,000.00, the partnership could request that the funds be released to Grissom Properties, Inc., upon delivery of "the irrevocable commitment" to the escrow agent; and if the account contained less than $200,000.00, the partnership would request that Bank return the funds by check directly to the limited partners. This litigation is primarily concerned with the language of this paragraph of the agreement.

For whatever reason, sale of the partnership interest got off to a slow start, and it became apparent that some additional time was necessary to raise the minimum sum. Therefore, on February 20, 1978, the Bank and the partnership, acting through Richard Snell, amended the termination date of the "escrow agreement" from midnight March 8, 1978, to midnight April 15, 1978. At the time of the amendment, no one had made a deposit in the escrow account and no one had given funds to Snell or the partnership to be deposited in that account. In short, there was no limited partner and hence no third party beneficiary to the contract called "escrow agreement."

Subsequently, on or about February 27, 1978, each of the plaintiffs deposited the sum of $13,500.00 in the "escrow account" of the Bank and each became a limited partner in the apartment venture.

As is customary in the financing of this type of limited partnership arrangement, a

proposal or prospectus describing the venture is disseminated to prospective investors. Zeta Realty of Texas, Inc., a San Antonio corporation of which Richard Snell was then executive vice-president, issued the proposal or prospectus for Grissom Apartments, Limited, described as "Limited Partnership for the Acquisition of a Forty (40%) Per Cent Equity Interest in Grissom Apartments." Page iii, headed "Statement of Prospective Investor," was a form of a letter addressed to Snell confirming receipt of the "Confidential Memorandum" for Grissom Apartments, Ltd. Among the statements in that letter which each recipient of a "Confidential Memorandum," including plaintiffs, had to acknowledge was that he had sufficient knowledge and experience in financial and business matters that he was capable of utilizing the information in the enclosed proposal to evaluate the risks of the proposed investment and also that he had sufficient financial means to bear the economic risk of the loss of his entire prospective investment.

On page iv, prospective investors were warned:

NOTICE: People to whom this offer will be presented should understand that there is an inherent risk in real estate investments, and, thus, this offer should be considered speculative. It is necessary to have sufficient knowledge to evaluate the merits and risks of this Limited Partnership and to bear the economic impact of the investment.

Pages 10 through 15 of the prospectus enumerated various "Risk Factors."

Pages 92 through 95 contain the separate instrument entered into by the Bank and Grissom Apartments, Ltd., described as Escrow Agreement. In the copy of the prospectus entered into evidence as Plaintiffs' Exhibit 3, the termination date of the "escrow agreement" was March 8, 1978. At the time of the amendment of that agreement, Snell told the Bank that Grissom Apartments, Ltd., would cause to be reproduced page 2 of the agreement upon which the amendment was made and would substitute that page in the prospectus. On February 28, 1978, the day after the plaintiffs became limited partners, Snell came into the Bank. In answer to a question by Massie who was then running the Bank, Snell admitted that he had not yet had the amended page of the escrow agreement reprinted and inserted in the outstanding copies of the prospectus.

On March 8, there was less than $200,000.00 in the escrow deposit in the Bank, but by April 15 there was more than $200,000.00 in the escrow account. On April 14, the Bank received a letter from Grissom Apartments, Ltd., pointing out that all requirements of the escrow agreement had been met and authorizing disbursement of some $65,000.00. Within two months, the Bank paid out some $286,497.35, all except the original $65,000.00 being paid to Grissom Apartments, Ltd.

Nearly a year later, plaintiffs became aware that all was not well with the project. Plaintiff Engle testified about a conversation which he had with a secretary at the project office:

Q: [by Mr. Sisk]
Can you tell us approximately the date when you became aware that the project was not moving?

A: [by Mr. Engle]
I had checked monthly throughout 1978 and early '79. The last part of February, I called down to Grissom's Apartments Offices to check on the K–1 form for income tax purposes.

And at that time, the secretary advised me that Mr. Snell was in London and I asked what he was doing there.

She replied that he's over there to finance—

MR. TEAGUE: Your Honor, I'm going to object to that. It's hearsay as to us.
THE COURT: I sustain the objection.

This colloquy indicates that the plaintiffs were keeping monthly surveillance on the progress of their investment. This was apparently the first time the plaintiffs took any action to determine whether sufficient funds had been invested by limited partners to avoid return of their individual invest-

ments. Colonel Engle testified that if there had not been an escrow agreement, he would not have placed any money in Grissom Apartments, saying, "This was my security." There is, however, no testimony that the plaintiffs relied upon the date of March 8, 1978, as contrasted with April 15, 1978. The escrow agreement assured them that they would receive their investment back if the general partner were unable to sell sufficient partnership shares to make the project viable. There was no testimony by the plaintiffs that they relied on the magic date of March 8; in fact, their actions dispelled any such reliance. These investors presented the prospectus to the Base Legal Officer at Randolph Air Force Base for his legal opinion, and they also took it upon themselves to check monthly progress with the project managers. They did not ask the general partner or the Bank just when the escrow account reached $200,000.00.

The trial judge found that on or about February 27, 1978, plaintiffs "accepted the agreement" between the Bank and Grissom Apartments, Ltd., by depositing $13,500.00 each into the escrow account which Grissom Apartments, Ltd., had at the Bank and thus became third party beneficiaries of the "escrow agreement." I agree with these findings, but I cannot agree with the trial judge's determination that the Bank owed the duty to plaintiffs to return their money on or soon after March 8, 1978. Nor could I agree with the trial court's conclusions of law that the change of date of termination was not binding on plaintiffs and that the bank improperly disbursed funds to persons other than plaintiffs because the agreement terminated as to plaintiffs on March 8, 1978. When plaintiffs "accepted" as third party beneficiaries, there was only one contract in being and it had a termination date of April 15, 1978.

The parties seem to agree, and the majority opinion holds, that a third-party beneficiary contract may be rescinded or modified by the original parties prior to acceptance by the third party. *Firestone Tire and Rubber Co. v. Fisk Tire Co., Inc.*, 131 Tex. 158, 113 S.W.2d 175 (1938); *Harry Newton,*

*Inc. v. H. Richards Oil Co.*, 385 S.W.2d 893, 898 (Tex.Civ.App.—Austin 1965, no writ). After a third-party beneficiary contract has been accepted by the third-party beneficiary, it cannot be rescinded or modified without the subsequent consent of the third party beneficiary. *Pacific American Gasoline Co. of Texas v. Miller,* 76 S.W.2d 833, 845 (Tex.Civ.App.—Amarillo 1934, writ ref'd). From the clear evidence and the fact finding by the trial court, these plaintiffs had not accepted the provisions of the "escrow agreement" prior to the time when Bank and General Partner amended the termination date.

Insofar as their actions against Bank are concerned, if plaintiffs had never accepted the third party beneficiary contract, they could not sue for breach of that contract. Plaintiffs do, however, bring their action for breach of the third party beneficiary contract, and the very act of instituting suit on that contract is sufficient to constitute acceptance of it. *Harry Newton, Inc. v. H. Richards Oil Co., supra.* Plaintiffs cannot have it both ways. If they have not accepted, they have not standing. If they have accepted, they could accept the only contract in existence at the time that they invested their capital to become limited partners.

The majority opinion adverts to a part of Grissom Apartments, Ltd., Limited Partner's Representation Letter, the terms of which were not modified and in which the limited partner understands that his funds would be escrowed until an irrevocable commitment is issued and received by the escrow agent in ONE HUNDRED TWENTY (120) days from the date of the escrow agreement. The bank was not a party to that agreement and may not be sued for breach of contract because the "escrowed" funds were not returned to plaintiffs by the Bank. The "escrow agreement" was included in the prospectus to give prospective limited partners information upon which they might decide whether to risk their investment capital. The Bank cannot be held liable for any contractual duties not encompassed within the "escrow agreement."

The majority does not suggest an opinion as to whether the Bank wrongfully paid out monies in violation of the provisions of the "escrow agreement" because the escrow agent had not received "the irrevocable commitment." In my opinion, the Bank did not receive the irrevocable commitment and therefore its payment of the funds entrusted to it as stake holder was wrongful, at least as to the plaintiffs herein.

I have searched the prospectus as well as this escrow agreement and have been unable to find a description of any irrevocable commitment by anyone to come forward with the funds to build the apartment complex. Exhibit I to the prospectus, entitled "Projection of Project Costs," indicates a projected total of $16,000,000.00, including $1,300,000.00 for land acquisition and $14,-200,000.00 for estimated construction costs for the 648 apartments. The next page, Exhibit II, is entitled "Distribution of Limited Partnership Funds." The total if $445,500.00, the maximum amount available from sale of limited partnership shares, assuming that the Forty Per Cent (40%) equity interest in Grissom Apartments was fully subscribed.

Nowhere in the prospectus is the prospective limited partner, including these plaintiffs, given assurance that $16,000,000.00 in project costs will be paid nor that arrangements have been made for their payment. There is no indication what lending agent would make the permanent loan. There is not even assurance as to who would make the interim construction loan, even though $120,000.00 of the projected distribution of the limited partnership funds would be for a commitment fee for an interim construction loan. While there is no precise definition of "irrevocable commitment," I am inclined to agree with plaintiffs who, in their petition allege that no escrow funds were to be distributed "until an irrevocable financing commitment was delivered to Defendant." It is only when the notion of financing is added to the language "irrevocable commitment" that the requirement in the escrow agreement makes sense.

I agree with the trial judge's finding that the irrevocable commitment was not delivered, and therefore the Bank breached its duty to plaintiffs as third party beneficiaries by paying out the "escrowed" funds before this vital condition precedent was met.

For that reason I would hold overrule Point of Error No. 9, and for that reason, and that alone, I would affirm the judgment of the trial court.